No. 10,709.

S. VIDALAT VS. CITY OF NEW ORLEANS.

1. It is settled beyond dispute that the distance of six squares, within which no private market can legally be established, must be computed by taking the far side of the streets around the public markets, and walking six squares the nearest way. This has been the rule since 1880, and during the term of the plaintiff's contract in 1884-86.

2. In case a farmer of the market revenues of the city of New Orleans seeks to recover damages on account of losses he has sustained by reason of competition with private markets illegally established within prohibited limits, it is his duty to make clear and satisfactory proof of the existence of such interfering establishments in the mode required by law.

3. The city authorities must be held to a reasonable and proper discharge of duties devolving upon it by its ordinances and the law; but it can not be mulcted in damages for violation of its contract, upon other than reasonably clear proof of dereliction of duty.

4. Such a case is one sounding in damages *ex contractu*, entitling plaintiff to reimbursement of loss actually sustained and the profit of which he has been deprived—that is, such as may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract.

5. In the interpretation of the contract power of a municipal corporation, much the same tests must be applied as those which are applicable to private corporations and individuals.

6. Such inconveniences as fairly result from the making of needed public improvements must be submitted to by all citizens of incorporated towns and cities, without compensation, each individual citizen being supposed to be recompensed by the enhancement of the general welfare and good of the community.

7 It is only in cases where there has been an unreasonable or unnecessary delay on the part of the city or the contractor, whereby injury has been inflicted on such a lessee, that actionable injury results.

APPEAL from the Civil District Court for the Parish of Orleans. *Monroe, J.*

*T. J. Semmes & Legendre, Leonard, Marks & Bruenn* and *Frank N. Butler* for Plaintiffs and Appellees:

1. The city of New Orleans, having leased the right to collect the revenues of the public markets to Vidalat & Co., was bound to maintain the markets in a condition to serve the purpose for which the right to collect such revenues was leased. It could not, therefore, lawfully do any act to diminish such revenues during the existence of the lease. Civil Code, Art. 2692.

2. The city of New Orleans having, in terms, expressly contracted to enforce the laws and ordinances relative to public and private markets, for the benefit of the market lessee, was required to close all private markets opened in contravention of such laws and ordinances, and, in default of so doing, became liable to plaintiff for the loss of revenue sustained thereby. La Rosa vs. The Mayor et als., 4 La. 24; Griffon vs. Mayor et als., 5 N. S. 279: Guillotte vs. New Orleans, 12 An. 480; City of New Orleans vs. Heirs of Guillotte, 12 An. 819.

3. The city of New Orleans having, by the express stipulations of the lease, provided that the entire area covered by the market houses, including the sidewalks bordering the same, and the portions of the streets spanned and covered by the market house roofs and aprons, should be devoted to market purposes, is bound to make good to the lessee the revenues lost by the city's arbitrary ejectment of all persons who were using such sidewalks and streets spanned by the market houses, for market purposes.

4. The city is also liable to the lessee for the revenues of which he was unlawfully deprived, by the city's destruction of the banquette on the Poydras street side of the Pilie market, in July, 1885; and by the said banquette being left in an impassable condition continuously from that date until the end of the lease, when it is established that it could have been repaired, at any time, in two weeks.

*Carleton Hunt*, City Attorney, for Defendant and Appellant:

The measure of damages is the amount of loss the plaintiff has sustained, and the profit of which he has been deprived, with the qualifications stated in Article 1934, R. C. C.

To recover damages, plaintiff must make his claim certain—to make it only proba ble is not enough. 17 An. 239.

The city of New Orleans is not responsible for the misfeasance or negligence, or the omissions of duty, of subordinate officers or agents employed in the public service. 8 Wend. 403-422; 9 Wheat. 720-723; Story on Agency, Sec. 319, p. 412

Such reasonable and necessary disarrangements as are the consequences of improvements to the city can not give rise to suits for damages. 2 Dillon on Municipal Corporations, fourth edition, sections 990, 991.

The opinion of the court was delivered by

WATKINS, J. As assignee, S. Vidalat, the plaintiff, claims of the city of New Orleans $100,000, on the averment that, by the acts and omissions of her officers and agents, his assignor, S. Vidalat & Co., suffered, during the term of its lease of the *public* markets, a diminution of profits to that extent.

This demand is founded on three different causes of action, of similar import, viz.:

1. His claim is that, for an alleged diminution of market revenues, arising from competition with the *private* markets, which, as lessor, the city had failed to suppress and prevent, as she was, in duty and in law, obligated to do, he is entitled to demand and recover $75,000.

2. That for and on account of eviction from certain spaces adjacent to certain of the market places he had sustained loss of custom and revenues aggregating $10,000; and—

3. That, on account of the banquette on the south side of Poydras street, in the immediate vicinity of the Pilie market, being torn up and left in an impassable condition for many months, through the fault and negligence of the defendant, and whereby access to the markets on that side was prevented, he had sustained a loss of $15,000—and for which last two items he is, likewise, entitled to demand and receive the additional sum of $25,000.

Plaintiff's claim is that, in October, 1884, Vidalat & Co. purchased at public auction the right or privilege of using and operating the public markets of the city for the period of twenty-six months, for a consideration of $421,000, payable in monthly installments of $16,-200, and under said contract—which was one of lease—the company acquired a right to all the market revenues derivable therefrom, under then existing laws and city ordinances then in force.

His further averment is, that all such laws and ordinances entered into and formed part of the contract; and that the city, also, bound itself by a special covenant to maintain and enforce such laws and ordinances for its lessee's protection against unlawful interference with its rights and privileges by private market people, and by all lawful means at its command.

On the trial there was a verdict in plaintiff's favor for $7500, without any specification of the particular demand, on account of which this allowance was made; and, after an unsuccessful effort, on the part of the defendant, to obtain a new trial, judgment was rendered accordingly, and it has appealed. In this court the plaintiff filed an answer to the appeal, and prayed for the judgment to be so amended as to allow him $85,000.

I.

With reference to the first item of damages claimed, the following appears to be a fair summary of facts, viz.:

That by the official map and other testimony, it is estimated that there were established and in operation during the contract of Vidalat & Co., 200 or 300 private markets. The purport of the testimony on this subject is that the distance or radius of six squares is indicated on a map by a series of circles, having radii of 2100 feet, measured on an air line from the respective market-houses— each corner being taken as the centre of a circle, and the line indicating its circumference that of the limit within which private markets were excluded.

Within the limits of these different circles, as indicated on the map, plaintiff's witnesses undertake to locate various prohibited private market-houses, by taking streets and their municipal numbers as their guide, and estimating their distances, respectively, from the public markets, by what they suppose to be 2100 feet.

On this theory, lists of such private market-houses have been elaborately prepared and filed in evidence.

There was but one witness who professed to have taken actual measurements, as appertaining to the lists; but cross-interrogation revealed the fact that the list he referred to was prepared in 1885-6, during the Vidalat lease, and that the measurements were made ·only two months previous to the trial in May, 1890.

The lessee gave due notice to the proper city authorities of the existence of these private markets, and demanded their suppression. The city made some efforts to abate them, but with, practically, little success.   There were some affidavits made against parties offending the private market ordinances, and some arrests were made, but no convictions secured.   There seemed to have been considerable opposition to the enforcement of the law.   To this effect is the testimony of the Mayor, of that time, his private secretary, police officers, and the City Attorney.

On this subject, the latter says:

" I have not my docket here; but the private market cases occupied a good deal of my time.   There was a good deal of opposition to them.   They went to the Supreme Court several times.

    *      *      *      *      *      *      *      *

"Q. I want to know whether you tried to close up the private markets?

" A. I did all I was called upon to do.   *   *   *   My associate attorney took them to the recorder's courts, and he attended to those cases; and, if I mistake not, S. P. Blanc, (who) was the attorney for Vidalat & Co., was associated with me in those cases, etc.

    *      *      *      *      *      *      *      *

" " The private market men were particularly litigous, and one decision did not seem to have the effect of a final judgment."

On the score of losses sustained on account of these private markets, the proof is desultory and suppositious.   It shows, substantially, that for the period between 1859 and 1868, the market revenues were farmed out for $400,000 per annum, and since the termination of Vidalat's lease, in 1886, they have been adjudicated for about $375,000 per annum.

There have been constantly in force since 1868, statutes and city ordinances permitting private markets, and their regulation has been constantly attended with similar difficulties to those which appear to have beset the Vidalat company.

The proof tends to show that during its lease there were many

stalls vacant, and that the profits were greatly less than seemed to have been contemplated.

In the lease there is a stipulation to the effect that all city ordinances relating to market leases then in force, whereby it was provided that private markets might be established in any portion of the city not within a radius of six squares of any public market, and whereby it was made the duty of the chief of police to prevent any private market being established within the prohibited limits, were to form parts of the contract, and the city, as lessor, undertook to maintain and enforce such ordinances by all lawful means.

Taken all in all, this testimony falls short of its purpose, and fails to make out a case for damages against the city on this score, and for several reasons.

(a) In the first place, the *modus operandi* of establishing the localities in which private markets were situated, was entirely incorrect and unsatisfactory.

This clearly appears from the testimony of the city surveyor, a portion of which we quote, as follows, viz.:

"Q. What is the difference between the radius-map (in evidence) and the distance or measurement used by the Supreme Court?

" A. This, by the Supreme Court, is in a walking distance of six blocks.

"Q. Then the map is not a correct guide as to the prohibited markets?

" A. No, sir.

" Q. This list of private markets, that you made at the request of Vidalat & Co., * * which are supposed to be within the prohibited distance, were made with reference to the radius?

" A. Yes, sir.

" Q. But that is not the list used by the Supreme Court, is it?

" A. No, sir.

" Q. * * This list that is introduced here, prepared by order of Vidalat & Co., was prepared according to this 2100 feet map?

" A. Yes, sir.

" Q. And this 2100 feet map is not a map by which the distance is to be ascertained?

" A. No, sir," etc.

Reference to decisions of this court in private market cases show

this testimony to be entirely correct.    State vs. Schmidt,. 41 An. 27;.
State vs. Barthe, 41 An. 46.

In the former case it was established, by the testimony of the
City Attorney of 1880, that the map in question was made under his.
instructions, and as a part of Ordinance No. 4798, of which he was.
author; and that the distance of six squares was, in contemplation
thereof, to be computed " by taking the far side of the streets around.
the market and walking six squares the nearest way."

This has been the rule to which this court has adhered ever since.
That rule was inaugurated under the city administration preceding
that under which Vidalat & Co. farmed the markets, and it was not.
changed subsequently.    The duty was plainly imposed on the plain-
tiff, at the trial in May, 1890, to have produced such evidence as
would have rendered his right clear to recover so large a sum as that
demanded against the city on this account.    This duty he did not.
discharge.    In so far as the testimony of the *single* witness, who tes-
tified that he had made *actual measurements* of the distances,. is con-
cerned, but little importance can be given to it,  because it is mani-
festly unreliable, it not being pretended that the *identical* private
markets in existence in 1885–6, when the lists were made,. had been
continued, in the same localities, to January, 1890, when the meas-
urements were taken.    And it is evident that actual measurements.
made in 1890, on the hypothesis that the list made in 1885 was still
correct, are unreliable, and such *data* is of very doubtful character.
It is quite unreasonable to suppose that any witness could, with any
sort of accuracy, have remembered the identity and localities of
200 or 300 private market-houses for such a length of time.

(*b*) In the second place, there is nothing to show that the city
authorities were wilfully and flagrantly neglectful of the lessee's
contract rights in this particular, or indisposed to perform their
duties.

Some efforts were exerted in this direction, but difficulties were
presented which seemed hard to overcome.

The contention of plaintiff's counsel is, that the city, having leased
the public markets to the plaintiff's assignor, was bound to maintain
them in a condition to subserve the purposes of the lessee, and could
not lawfully do any act to diminish the revenues thereof during its.
existence, and the city, having expressly contracted to enforce the
laws and ordinances relative to private markets for the benefit of.

the plaintiff as market lessee, was required to close all private markets opened in contravention thereof, and in default of so doing it became liable in damages.

As applicable to this theory, the case of LaRosa vs. The Mayor, 4 La. 24, is cited and relied upon. In that case the city adjudicated to the plaintiff the *exclusive* right of vending oysters at designated stands, *and prohibited the sale of oysters at all other places*, and the plaintiff was awarded damages against the city in consequence of its failure to enforce the prohibition of its ordinances. But, in the plaintiff's case, now under consideration, the right acquired to the revenues of the public markets was necessarily subordinated to the laws and ordinances specially *authorizing* the establishment of private markets elsewhere, in any part of the city not within prohibited limits.

The element of uncertainty *in this case* is the failure of the evidence to show that the private market houses were within prohibited limits, for in the absence of such proof they were presumably authorized.

The claim of plaintiff is one sounding in damages *ex contractu*, and he is only entitled to be reimbursed the loss he has sustained under his contract, and the profit of which he has been deprived; that is, "such damages as were contemplated or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract." R. C. C. 1934.

Plaintiff's evidence leaves our minds in doubt of his contract having been violated by the city, and if, for the sake of argument, this were conceded to have been made plain, this is not otherwise shown to be a case for the allowance of damages.

In the interpretation of the contract powers and duties of a municipal corporation, much the same tests must be applied as those which are applicable to private corporations and individuals. 2 Dillon's Munic. Corp., Sec. 935, 3d Ed.; Walling vs. Mayor, 5 An. 660; Arrowsmith vs. Gordon, 3 An. 105; Smith vs. Thulton, 17 An. 240; Gobet vs. Municipality, 11 An. 300; McCord vs. Railway Co., 3 An. 285; Virgus vs. Forshu, 9 An. 294.

## II.

With regard to plaintiff's eviction from certain spaces adjacent to certain of the market-houses, and the consequent loss of custom he

Vidalat vs. City.

sustained thereby, through the unlawful act of the city, in our opinion a case for damages is not made on the law and evidence.

Plaintiff's lease was made and confirmed, subject to all existing laws and ordinances relating to market leases generally, and among them was ordinance No. 479, C. S., Section 25 of which particularly describes the *locus in quo* to be leased, as follows, viz.:

" That the entire areas covered by the several market-houses, including the sidewalks bordering the same, and that portion of certain streets *spanned and covered by said market-houses*, and, also, certain squares of neutral ground fronting St. Mary's Market, are understood to be devoted to market purposes, *except, however, a free and unincumbered passage-way* on all the *said sidewalks bordering the said markets, which passage-way shall be kept free from obstruction.*"

And for the evident purpose of reënforcing this descriptive enunciation of said ordinance, the provisions of Section 32 declare " that it shall be *unlawful for any person to occupy any portion of the sidewalks or pavements bordering any of the public markets of the city by depositing for sale or other purposes any articles whatsoever calculated to obstruct the free passage thereof by pedestrians, or to erect, or to continue if already erected, in or over the sidewalks or pavements, any awning, shed, bench or partition,* ⁕ ⁕ ⁕ without permission of the commissioner,*" etc.

During the course of the trial the judge *a quo* limited and restricted plaintiff's evidence to the requirements of the ordinance, and excluded all other. In this he was evidently correct, and the result was that the evidence failed to show any illegal evictions by the city authorities.

From the evidence, it appears that quite a number of persons who, in 1884 and 1885, occupied portions of open space in front of the French market, and vended their wares and merchandise, such as coffee, soda water and cigars, under awnings stretched overhead, were displaced and removed by the city authorities about the first of the year 1886, and were never permitted to re-occupy same thereafter. But these stands were *not kept under the aprons of the market*, but on the sidewalks or pavements adjacent to the market house, and formed obstructions to the free use of same, within the terms and plain meaning of said ordinance, and were removable.

Surely plaintiff has no well-founded claim for damages against the

city on account of loss of custom, or diminution of revenues, on this account.

III.

This claim of $15,000 damages because access to the Pilie market on the Poydras street side was temporarily obstructed, on account of the banquette adjacent to the market house being torn up during some two or three months, while the street was undergoing repair, is wholly without any foundation.

The proof shows that the Barber Asphalt Paving Company had undertaken a contract to lay that portion of Poydras street in the vicinity of the Pilie market, with sheet asphalt, and that for that purpose the banquette adjacent was unavoidably torn up, or necessarily obstructed.

While it is true that this condition of things was suffered to continue much longer than seemed necessary for a speedy and energetic accomplishment of the work, yet we can not detect anything in the evidence that would justify us in the belief that either the city or the paving company were grossly negligent of their obligations, or wilfully did the plaintiff an injury. And it is well established by authority, that such inconveniences as may fairly and legitimately result from the making of needed public improvements, must be submitted to by all citizens of incorporated towns and cities, without compensation; each individual citizen being supposed to be recompensed by the enhancement of the general welfare of the community. 2 Dillon's Mun. Corp., 4th Ed., Sec. 990.

In contracting for such public street improvement, the defendant evidently acted within the scope of its contracting power. Barber Asphalt Paving Company vs. Gogreve, 41 An. 251, Sec. 7, Art 20 of 1882.

This is clearly a case of *damum absque injuria* in this respect.

On the whole, we arise from a very careful examination of the record, and a study of authorities applicable, with the conviction that the plaintiff is entitled to no damages against the city; and that the verdict of the jury and the judgment thereon based should be reversed *in toto*.

It is, therefore, ordered and decreed that the judgment appealed from be annulled and reversed, and it is now ordered and decreed that there be judgment rejecting plaintiff's demands at his cost in both courts.