This is a companion suit to Thieme v. Louisiana Highway Commission, 5 So.2d 167, and Jarnagin v. Louisiana Highway Commission, 5 So.2d 660, heretofore decided by this court and to No. 6406, Carter v. Louisiana Highway Commission, 6 So.2d 159, this day decided. All are against same defendant and grew out of the erection of an attractive modern concrete and steel overpass and approaches in Lafayette Street in the City of Winnfield, to supersede an old wooden unsightly bridge. Each case presents different state of facts, mainly due to difference in location of property affected with respect to the overpass.
Plaintiff, at time of construction of the overpass and for some eighteen years prior thereto, owned a lot fronting 105 feet on Lafayette Street, north side, and extending back northerly 110 feet, on which was then and now is located two frame duplex apartment houses. Since 1930 these apartments were let to tenants. The lot, on its east side, abuts Gum Street which intersects Lafayette Street at right angles.
Prior to the erection of the overpass Lafayette Street was paved by the city at the expense of the abutting property owners. Also, a sidewalk, four and one-half feet wide had been laid in front of plaintiff's lot. The overpass spans a cut several feet deep occupied by tracks of the Chicago, Rock Island and Pacific Railroad.
The City of Winnfield granted to the defendant the right to erect the new overpass and to alter and utilize those portions of Lafayette Street included within the limits of the project to the extent and in the manner necessary.
The contract for the building of the overpass was let in May, 1936. Work thereon began in February, 1937, and was completed in February, 1938. Its east end is on a line with the west boundary of plaintiff's property and rests upon a concrete bulkhead bisecting the street. At this line the street level was raised 20 inches and from there its surface declines easterly for 78.15 feet; from thence it gradually rises easterly for a distance of several hundred feet. The original paving in front of plaintiff's property and the sidewalk along its entire front, it was found necessary to tear up and remove in order to construct the approach and drainage structures designed to take care of rainfall upon the road and adjacent area.
Soon after the completion of the project, plaintiff, believing that his property, as well as himself, had suffered damages, because of the erection of the overpass and its eastern approach, instituted this suit wherein he seeks restitution of the loss allegedly sustained.
The demand embraces the following items of damages, viz:
1. Value of pavement destroyed .................... $ 293.25 2. Value of sidewalk destroyed .................... 100.00 3. Loss of rents on apartments during construction period ......................................... 285.00 4. Damage to property by reducing its market and rental values .................................. 1000.00 5. Amount expended in raising level of yards ...... 35.00 -------- Total .................................... $1713.25 *Page 155 
The most serious of these items and the one around which the contest wages most fiercely is No. 4. As to this, plaintiff alleges that on account of the raise in the street's surface elevation, the manner in which the pavement approaches the overpass, the construction of the overpass and approach, his property has been greatly damaged and "rendered much less valuable and usable for the purposes for which the same was built." Amplifying these general allegations, it is averred:
"That as a result of said construction, petitioner's two duplex apartment houses are placed down on a lower grade and level than they were before said project was constructed, and below the level of the paved highway approximately two feet. That before said project was constructed, said property was on the level with the street, was readily accessible from the street, and had a level, well-kept turfed yard, but now since the said acts of said Defendant, said property is much lower than the grade of the street and has been put down beneath prominent shoulders and curbs and much of the drainage from said road is thrown into his yard and under the houses, and that it is impossible to keep said property in a proper and well-kept condition due to the poor drainage and raising of the level of the street in front of his said property and said property has been rendered inaccessible from the street."
Defendant, after admitting the construction by it of the overpass and approaches, denied all other allegations. However, prior to answering, defendant excepted to the sufficiency of the petition on the ground that it disclosed neither a cause nor a right of action. Special counsel for appellant state in brief that general counsel will probably desire to file brief in support of the exceptions. This has not been done. For this reason we shall omit further discussion or reference to the exceptions on the assumption that they have been abandoned.
Judgment was rendered for plaintiff for the full amount sued for in items 3, 4 and 5, with legal interest from judicial demand, and costs. The defendant appealed. Since the appeal has not been answered, the lower court's rejection of items 1 and 2 is final. Anyway, there is no merit in either item for the obvious reasons that the sidewalk destroyed has been replaced by a better one and the surface of the street from curb to curb has been repaved; and, additionally, title to the pavement and sidewalk vested in the city whose consent was given for their destruction.
Plaintiff's suit and right to recover to any extent have as their basis that part of Section 2, Article 1 of the Constitution, which reads as follows:
"Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."
The claim for loss in rentals during the period of construction arises from the fact, as alleged, that on account of the tearing up of the pavement and sidewalk and general disarrangement of surface conditions in front of plaintiff's property, access thereto by automobiles for a goodly part of the time was rendered impossible; that this caused tenants to give up their apartments which remained vacant until the mentioned condition ceased.
The testimony is not conclusive that all the tenants who vacated the property while construction work was in progress, did so because of conditions then existing. None of them was introduced as witness. It is possible, however, that new tenants were not easily procurable because of said conditions.
We think a pecuniary loss of this character is not comprehended within the "or damaged" provision of the Constitution because such a loss is not in reality a damage to the property but a personal deprivation to the owner. It is in effect an injury to business and it has been held that business losses due to public improvements are not compensable under the quoted Constitutional guaranty. McMahon and Perrin v. St. Louis, Arkansas Texas Railroad Company, 41 La.Ann. 827, 6 So. 640; City of Shreveport v. Kansas City Southern Railway Company et al., 193 La. 277,190 So. 404; Chicago v. Taylor, 125 U.S. 161, 8 S.Ct. 820, 31 L.Ed. 638.
In addition to these reasons it is settled beyond debate that temporary interference with property rights or the rendering for a time use of property more inconvenient, when done for public purposes, do not amount to a "taking" and loss resulting therefrom does not fall within the "or damaged" organic provision. Sacrifices of this character are due by all property owners for the benefit of the general *Page 156 
public. And, as said in the McMahon and Perrin case [41 La.Ann. 827, 6 So. 641]:
"Mere consequential injuries to the owners, arising from discomfort, disturbance, injury to business, and the like, remain, as they were before, damna absque injuria, — particular sacrifices which society has the right to inflict for the public good."
See also, S. Vidalat v. City of New Orleans, 43 La.Ann. 1121-1130, 10 So. 175; 18 Am.Jur. 769, § 142.
Plaintiff's lot slopes northerly from Lafayette Street. The record does not disclose the difference in elevation between the front and rear lines. It is shown that there is a 2 foot fall from the front of one of the buildings to its rear, a distance of 52 feet.
The original sidewalk in front of the lot was practically level its entire length. The new one rests upon a newly made foundation which rises as it goes westerly. This was necessary because of the incline in the road's surface toward the overpass. The walk is on a level with and joins the six inch curb of the road and perforce is higher than any part of the surface of plaintiff's lot. Water that runs over the curb, of course races across the walk, falls upon the lot and gravitates northerly.
Prior to the change in the street level and other alterations of its surface conditions made necessary by the erection of the overpass, plaintiff's lot was not subject to injurious overflow from rainfall. No water found its way across the lot save that which fell upon it. This satisfactory condition ceased because of the mentioned changes.
Before the overpass was erected, Lafayette Street in front of plaintiff's lot was practically level. Rainfall thereon was conducted westerly through open drains and finally discharged where it would do no injury to anyone. Changed physical conditions made necessary the installation of an entire new drainage set-up. Rain water that originally fell on the street in front of and west of plaintiff's property, and drained westerly, from mere gravity, was forced to run easterly. At the east end of the 78.15 foot decline, above mentioned, this water meets that which comes easterly for a distance of three or four blocks. At this point, designed to take care of this confluence of waters, a concrete catch basin 33 feet long bisects the street. It is 20 inches wide, 2 feet 7 3/8 inches deep at its south end and 3 feet 4 inches deep at its north end. This end is in front of plaintiff's lot. At its north end the catch basin is connected to a storm sewer of same capacity which runs at right angle easterly to Gum Street, thence at right angle north up that street for 131 feet at which point the water is discharged into an open drain or ditch.
In the surface of the road over the catch basin there was placed a line of trap inlets or grates, through which the water falls into the basin and begins its journey northward. These inlets extend from curb to curb, a distance of 33 feet.
The plans and specifications followed in the construction of the overpass, the approaches and the drainage system in connection therewith, were prepared by defendant's engineers. They are said to be in accordance with the best standards of practice for such structures, and were approved by the Bureau of Public Roads of the United States. W.P.A. funds contributed substantially to the cost of the improvements.
Defendant's engineer, who supervised the work, testified that the drainage system was amply adequate to take care of heavy rains on the adjacent watershed; in fact, would adequately serve a much larger area. When asked to explain why, during fairly heavy rains, water overflowed the road, ran over the curb and walk in large volumes and covered plaintiff's lot, replied, in his opinion, it was because debris, leaves, etc. had clogged the trap inlets and/or the drainage line. However, while the case was on trial this engineer inspected the drainage line through the inlets and manholes but found no accumulation therein in quantities sufficient to retard the free flow of water. He advanced the theory that leaves could have covered the inlets and effectively prevented free passage of water through them. This perhaps could happen to some extent in the autumn, the season when leaves do fall, but the theory is untenable for other seasons, especially in the spring time when leaves do not fall but heavy rains do.
The testimony shows beyond doubt that this property has been overflowed several times from not unprecedented rains; that the fast moving waters cover the entire lot, scour the area under the buildings, and wash pier foundations, causing the buildings to settle. *Page 157 
There is no escape from the conclusion that the damage done plaintiff's property, progressive in character, is directly traceable to the inadequacy of the new drainage system. Theories serve as bases for conclusions so long as they are not exploded by actual experience. When this happens, such theories have to be discarded as being unsound in the particular case. So long as the drainage system under discussion was not put to the test, it was confidently assumed and thought that it was adequate to serve the purpose for which designed, but when the test came it failed to meet expectations, with the results above mentioned.
The fact that the new sidewalk was built on an elevation considerably above that of the lot's front line, detracts materially from the property's good appearance. Some of the witnesses describe the buildings as being in a "hole". The floors of the building are on a level with the sidewalk.
In addition to the discussed conditions wrought by the erection of the overpass, the approach and drainage system, proximity of the end of the overpass to the driveway to the garage serving the westerly building constitutes a hazard of the first magnitude. This driveway abuts the bulkhead on which the east end of the overpass rests. To gain the street therefrom an automobile must be backed southerly over a rise of approximately 30 inches (elevation of sidewalk) and then descend to the street proper. The view to the driver's right (east) is open for several blocks, but the high concrete banisters of the overpass, augmented by a massive concrete post at their eastern end immediately to the driver's left, almost completely obstruct vision to the westward until the car's rear end is near the middle of the street. It is suggested that this hazard could be eliminated by altering the garage's position and building a passage way therefrom to Gum Street. This may be true but to do so would entail some expense which may properly be considered in determining the quantum of damages sustained by the property.
The two buildings on plaintiff's lot are worth approximately $5,000. The lot itself has a value of less than $1,000. The witnesses best qualified from residence and experience to give testimony touching the quantum of damages caused to the entire property, fixed the diminution in market value at from twenty-five per cent to thirty-five per cent. These witnesses live in Winnfield. They have had considerable experience in buying, selling and/or dealing in real estate of that locality. They know local values from rental standpoint and otherwise. Such testimony should prevail against that of persons who do not live there, some of whom were unable to perceive that the property had been damaged to any extent or its sale or rental value lessened. The lower court unhesitatingly agreed with plaintiff's witnesses' testimony and gave judgment for the full amount sued for in this item. We find no error in the court's conclusions thereon.
We think plaintiff is not entitled to recover the amount expended by him to build up the yards. This was made necessary on account of the elevation of the sidewalk and erosion from rain fall. It was an attempt to remedy a part of the sustained injury, the total amount of which is also sued for. The greater includes the less.
The fact that the apartments were being rented at time of trial for only about ten per cent less than at time the overpass was begun, does not argue strongly against plaintiff's contention anent diminution in the property's market value. Economic conditions and other factors always affect rental values, particularly in a small city. At time of trial and prior there was an active demand in Winnfield for apartments. All therein were rented. Conditions could change quickly and only the best and most modern rental places be occupied.
Appellant challenges the correctness of the judgment in awarding legal interest from judicial demand and condemning it to pay costs. Being a state agency, charged with the discharge of duties pertaining to the state, appellant contends it is immune from being cast for interest and costs.
Article 1935 of the Civil Code defines interest as being damages due for delay in performing an obligation to pay money, and Article 1938 ordains that all debts bear interest at the rate of five per cent per annum from time due unless there is a stipulation to the contrary.
So far as concerns the question of interest, as a general rule, appellant's position is correct. We think, however, the rule is not applicable to liabilities arising from the exercise of the right of eminent domain, or to claims for damages for injury to private property incurred in the prosecution of *Page 158 
a public work, coming within the purview of the "or damaged" provision of the Constitution. To hold otherwise would at least violate the spirit of the constitutional guaranty wherein it is provided that private property shall not be damaged except for public purposes "after just and adequate compensation is paid." To delay payment of damages without payment of interest for the delay would be inequitable and not that "just" compensation vouchsafed by the organic law. This principle is uniformly recognized by the Federal courts.
In United States v. Sargent, 8 Cir., 162 F. 81, 83, the court discussed the question and said:
"It is well settled that, in the absence of a stipulation to pay interest or a statute allowing interest, none can be recovered against the United States upon unpaid accounts or claims. * * *
"It is upon or in analogy with this principle that the United States contends that interest upon the amount of the award in this case should not have been allowed. We are unable to agree with this contention. * * *
"The landowners are not plaintiffs prosecuting claims, but defendants resisting a proceeding to deprive them of what is theirs until a condition precedent is fulfilled. Mason City [
Ft. D.] R. Co. v. Boynton, 204 U.S. 570, 27 S.Ct. 321, 51 L. Ed. 629. The exercise of the right of eminent domain is a prerogative of sovereignty in this country, but it is subject to the condition imposed by the Constitution of paying `just compensation therefor.'"
Interest was allowed on price of land taken from date of the commissioner's report.
The Sargent case is referred to approvingly by Justice Day in United States of America v. William E. Rogers, 255 U.S. 163, 167, 41 S.Ct. 281, 65 L.Ed. 566-569.
And in Seaboard Air Line Railway Company v. United States,261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664, as reflected from the syllabus, the court held:
"Under the constitutional provision of just compensation for property taken under the right of eminent domain, interest upon the award from the time of the taking to the judgment must be allowed against the United States, in case of condemnation by it."
There is no act of Congress which authorizes the courts to condemn the Federal Government or any of its many agencies to pay interest on judgments in condemnation cases. The courts, themselves, have done so out of equitable considerations and a desire to promote justice.
The case of Lawrence v. Second Municipality, 2 La.Ann. 651, conforms to the Federal Court decisions. There, plaintiff's lots were taken into possession by defendant, a public, political entity, under an ordinance authorizing such action. The lots were dedicated to public use. The court said:
"The alienation was forced upon him, and it must be considered as having taken place when he lost possession of the property. Town lots in the improved parts of the city are productive property, and interest is due on the price of them. C.C. 2531."
In City of New Orleans v. New Orleans Land Company et al.,173 La. 71, 136 So. 91, the court disallowed a demand for interest from date of lis pendens, on the theory that the property was from that time taken out of commerce and held that for interest by way of damages to be allowed, the principal must be due and demandable at date from which interest begins to run; that the price of the property at date of lis pendens had not been fixed.
From these two decisions it would appear that the Supreme Court of this state is disposed to follow the jurisprudence of the Federal Courts.
As regards liability for costs, we have reached the conclusion that Act No. 135 of 1936 is controlling. This act exempts the state, parishes, boards, commissions, etc., from payment of costs in any judicial proceeding, but provides that it "shall have no application to stenographers' cost for taking testimony". This same question is tendered in suit No. 6406, entitled Leon C. Carter v. Louisiana Highway Commission, 6 So.2d 159, decided by this court today. What is said on the subject in our opinion in that case is here adopted.
Plaintiff prayed for and was given legal interest from judicial demand.
For the reasons herein assigned, the judgment appealed from is amended by reducing the principal amount thereof to one thousand ($1,000) dollars and casting defendant for stenographers' cost for taking testimony, and, as thus amended, said judgment is affirmed. *Page 159