477 So.2d 744 (1985)
DICKIE'S SPORTSMAN'S CENTERS, INC.
v.
DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT of the State of Louisiana, and Boh Brothers Construction Co., Inc.
No. 84 CA 0265.
Court of Appeal of Louisiana, First Circuit.
August 21, 1985.
Writ Denied November 8, 1985.
*745 F. Barry Marionneaux, Plaquemine, for plaintiff-appellee, Dickie's Sportsman's Centers.
Bryan Miller, Asst. to Gen. Counsel, Dept. of Transp. and Development, Baton Rouge, for defendant-appellant, State of Louisiana, Dept. of Transp. and Development.
Robert L. Kleinpeter, Kleinpeter, Kleinpeter & Kleinpeter, Baton Rouge, for defendant-appellant, Boh Bros. Const. Co., Inc.
Before COLE, CARTER and LANIER, JJ.
CARTER, Judge.
This appeal involves State Project No. 56-06-47, which involved improvements to Louisiana Highway 1 in Iberville Parish.

FACTS
The Department of Transportation and Development of the State of Louisiana (Department) contracted with Boh Brothers Construction Company, Inc. (Boh Brothers) for certain improvements to Louisiana Highway 1 in the City of Plaquemine in Iberville Parish. The proposed improvements were widening the highway and constructing a new bridge. Dickie's Sportsman's *746 Centers, Inc. (Dickie's) owned a combination convenience store and bait shop along the west side of Highway 1 between the old bridge and the railroad tracks. To make the improvements, the Department, in connection with Project No. 56-06-47, negotiated with Dickie's for the purchase of a portion of Dickie's property. This portion of Dickie's property, approximately five feet in width and 120 feet in length, lay immediately adjacent to Highway 1 and formed the outer boundary of Dickie's parking lot. On July 29, 1977, H.A. Doming, Jr., president of Dickie's, signed the Act of Sale conveying the narrow strip of property to the Department.
The first phase of construction, the construction of the new portion of Highway 1 running north together with the new bridge, commenced in September of 1977 and continued for approximately one year. In December of 1978, construction commenced on southbound lanes of Highway 1. This last phase of construction was completed in June of 1979.
On May 28, 1980, Dickie's filed suit against the Department and Boh Brothers. In its petition, Dickie's alleged that it suffered both property damage and loss of profits as a direct result of Project No. 56-06-47. Dickie's sought judgment in solido against the Department and Boh Brothers. The Department answered, denying plaintiff's allegations. The Department also filed a third party demand against Boh Brothers, alternatively claiming that Boh Brothers had by contract agreed to hold harmless and indemnify the Department for damages, that the damages were caused by the negligence of Boh Brothers which required Boh Brothers to indemnify the Department, or that, if the Department and Boh Brothers were found to be joint tortfeasors, the Department was entitled to contribution for all damages. Boh Brothers denied liability to all parties on both the main and third party demands.
The trial judge, in his written reasons for judgment, concluded that Dickie's suffered losses as a result of the public work and held the Department and Boh Brothers solidarily liable for all damages. Accordingly, the trial judge rendered judgment in favor of plaintiff for $6,638.00 for lost profits and $1,660.00 for attorney's fees.
From this judgment, both the Department and Boh Brothers appeal, alleging numerous assignments of error.[1] Additionally, *747 both Dickie's and Boh Brothers answered the appeal.[2]

INVERSE CONDEMNATION
The trial court found and Dickie's asserts on appeal that plaintiff's right to recover damages is based on the theory of inverse condemnation. The trial court found and Dickie's asserts on appeal this cause of action is rooted in LSA-Const. Art. 1, § 4, which provides, in pertinent part, as follows:
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit.... In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. [Emphasis added].
The first sentence of Article 1, § 4 set forth above is derived from La. Const. of 1921, Art. I, § 2, which provided, in pertinent part, as follows:
Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purpose and after just and adequate compensation is paid. [Emphasis added].
Where a constitutional provision similar or identical to that contained in a prior constitution is adopted, it is presumed such provision was adopted with the construction previously placed on it by the jurisprudence. State in Interest of Cox, 461 So.2d 658 (La.App. 1st Cir.1984), writ denied, 464 So.2d 1375 (La.1985). Under the jurisprudence interpreting the 1921 constitutional provision, if property was not "expropriated," a cause of action was still available if the property was "taken and/or damaged" for a public purpose; such an action was called an inverse condemnation. Reymond v. State, Department of Highways, 255 La. 425, 231 So.2d 375 (1970); Gray v. State, Department of Highways, 250 La. 1045, 202 So.2d 24 (1967); Key v. Louisiana, Dept. of Highways, 357 So.2d 1230 (La.App. 2nd Cir. 1978), writ denied, 359 So.2d 1304 (La. 1978), and writ not considered, 359 So.2d 1309 (La.1978); M. Dakin & M. Klien, Eminent Domain in Louisiana, § 2(3) pp. 64-64 (1970). This cause of action is likewise available under the 1974 constitutional provision. Skye Rlty. Co. v. State, Dept. of Highways, 345 So.2d 249 (La.App.3rd Cir. 1977).

IMPAIRMENT OF ACCESS
The trial court held and Dickie's asserts on appeal that the Department's failure to provide adequate ingress and egress to Dickie's parking lot resulted in a substantial loss of customers and profit.
The owner of land abutting a public roadway has a property right to access (ingress and egress) to the roadway.[3] M. Dakin & M. Klein, Eminent Domain in Louisiana, § 4(D) pp. 117-129 (1970); M. Miller, Expropriation Compensable Items In Louisiana, 24 La.L.Rev. 849, 862-863 (1964). If a public authority substantially interferes with the owner's right of access, the owner has a cause of action under the *748 constitution for just compensation. State v. Department of Highways, 200 La. 409, 8 So.2d 71 (1942); Mills v. State Through Dept. of Highways, 416 So.2d 957 (La. App.2nd Cir.1982), writ denied, 420 So.2d 173 (La.1982); State, Department of Highways v. Strickland, 290 So.2d 714 (La.App. 1st Cir.1974), application denied, 295 So.2d 177 (La.1974); State, Through Department of Highways v. Terry, 194 So.2d 144 (La.App. 1st Cir.1966). Conversely, where the means of access to the public roadway are not substantially impaired or access is impaired only on a temporary basis and/or the inconvenience to the owner is not peculiar to him but general to the public at large, no recovery is allowed. Reymond v. State, Department of Highways, supra; Vidalat v. City of New Orleans, 43 La.Ann. 1121, 10 So. 175 (1891); Hebert v. State, Department of Highways, 238 So.2d 372 (La.App.3rd Cir.1970), writ denied, 256 La. 911, 240 So.2d 373 (1970); Edwards v. United Gas Pipeline Company, 164 So.2d 108 (La.App. 1st Cir.1964), writ denied, 246 La. 592, 165 So.2d 485 (1964); Dupont v. Thibodo, 5 So.2d 383 (Orl.La.App.1942). A public authority may divert traffic for purposes of public safety under its police power without incurring liability. Rudolph Ramelli, Inc. v. City of New Orleans, 233 La. 291, 96 So.2d 572 (1957). Further, points of entry and departure to a public way may be restricted for legitimate traffic safety reasons. Skye Rlty. Co. v. State, Dept. of Highways, supra.
Therefore, the issue before us is whether the Department, in exercising its authority to limit the right of access under its police power, substantially interfered with Dickie's constitutionally protected right of access.
Mr. Thomas Setze, assistant project engineer for the Department, testified as to the sequence of construction of Project No. 56-06-47 as follows:
A. It's the new bridge. We also were going tothis was the first stage of construction; this is the first thing we did, we built this new bridge. That included some of this heavy orange, which is a new barrier curb with this accesses, no crossovers, heavy orange.
Q. Let me interrupt you here, sir. Could you tell us when the new construction began on the new bridge project?
A. I'll have to check the diagram; I'm not really sure. It began somewhere in ...
Q. Why don't we delay the answer to that question
A. There was some hesitation about that because there was a problem with the railroad right of way which delayed some of it.
Q. Okay. Why don't you go ahead and just explain the rest of the color coded map and then we'll get back to when the construction began?
A. All right. In the process of building basicallythese are the northbound lanes is in the light orangein the process of doing that we also built across part of the southbound lanes which would connect to Bayou Road, and that was some four slabs to connect to Bayou Road. It did not involve much, maybe just a tad going into the old roadway. Basically the old roadway was still the same up until December the 15th, 1978, when all of this was constructed and all of the heavy was constructed, and we had still not touched the old road.
The southbound lanes, which we started constructingwe changed the traffic over off the old road to the new road on December the 15th, 1978, and we started building the southbound lanes. The southbound lanes are a little complicated with the single cross-hatching and the double cross-hatching because the double cross-hatching is actually bridge. You think you're riding on the ground out there, but you're riding on a bridge right up to about midway through Dickie's, and then there's a little strip of bridge that continues on down through to Eden Street.

*749 Basically, from FebruaryI mean from December of '78 until June 6th, 1979, we were in the construction of the southbound roadway; and we came in and we built the bridges all through here and we built this piece of road with the single orange cross-hatch in that time period, from December to June.
Q. That's from December of '78 to June of '79?
A. Right.
Q. Okay.
A. Then we had to come back in and reconstruct the Bayou Road intersection, and we did that in two phases. We did the south half first and the north half second so we could maintain traffic on Bayou Road.
The south half we started removing inwe removed fromwe removed from June 7th to June 27th and it was actually reconstructed in that period, too. We removed thetheI don't know whether to call that doublewe removed the red diagonal from top right to bottom left portion and replaced it with the diagonalsingle diagonal orange.
Q. Let me ask you this, sir: When you did this work on the area that has the red marks on them,
A. Right.
Q. were they donewould you have to dig up the old roadway?
A. The old roadway had to be removed.
Q. Completely?
A. Completely.
Q. All right. Would I be right in assuming that from December the 15th of 1978
A. Um-hum.
Q. that the old road, the old road southbound lane would have been closed to traffic during the entire time from December the 15th, '78, until this roadway was completed?
A. Well, I'll grant you that except for five days.
Q. Okay, but other than
A. For the first five days we let traffic go over here because he was working in this immediate area here; but after that he had to come down and really interfere with the roadway, so we closed the traffic off at that point on the 20th.
Q. So your testimony is that from December 20th of 1978 the roadway was completely closed to southbound traffic?
A. The old roadway.
Q. That's correct. The old roadway was closed to southbound traffic and you re-routed it on the new bridge portion of the highway?
A. This is correct.
Q. Until 7/30 of '79?
A. No, no.
Q. Until when?
A. Until June 6th of '79.
Q. So that's about a six month period?
A. Almost six months.
Q. Almost a six-month period that that roadway was closed completely to southbound traffic over the old roadway.
A. This is correct.
Q. Okay. You can continue, sir.
A. All right. Then we came back here and we built, like I say, the south half of Railroad Avenue, and then we got that over and we closed this north half off and built this north half and that would beand also finished tearing up the road. And that's basically the sequence of construction that was planned originally and that we followed.
Setze further testified that at no time during the construction period was access to Dickie's completely closed off. Although traffic along Highway 1 was re-routed in some instances and slowed in other instances, Setze testified that Dickie's was always accessible to the traffic on Highway 1 from both north and south.
Setze observed that for two to three weeks during the construction, the traffic used Dickie's parking lot as a thoroughfare, but that in January Robert Campos, *750 Dickie's manager, placed a barricade east of the store between the building and the old roadway to stop the flow of traffic through Dickie's parking lot.
Charles Doming, one of the owners of Dickie's, testified that the Department did not provide Dickie's with a separate ingress and egress to his property at all times, but that access to the property was available. In fact, Doming testified that the traffic began detouring from the highway onto his property, so Dickie's put up a barricade. Doming acknowledged that the local people complained about the barricade.
Similarly, Hymel Doming testified that the Department did not provide Dickie's with a separate entrance and exit. However, Hymel Doming expressed similar complaints about the traffic using Dickie's parking lot as a thoroughfare.
The manager of Dickie's during the construction, Robert Campos, testified that Dickie's always had an entrance, but that it was sometimes difficult to determine exactly where the entrance was located. Campos also voiced complaints about the traffic which flowed onto their parking lot, until he erected barricades to impede the flow of traffic.
Judy Magee, an employee of Dickie's during the construction, testified as to the public's use of Dickie's parking lot as a thoroughfare. She further testified that the manager of Dickie's placed a barricade to prevent the local people from driving through the parking lot, which was the reason fisherman encountered difficulty in maneuvering their boats through Dickie's lot.[4]
Noland Brown, a fisherman and customer of Dickie's, testified that during the construction he refused to take his new boat into Dickie's parking lot. Brown explained that he had a new boat and would have been required to drive over a pile of dirt along the edge of the highway to get to Dickie's, which he refused to do. Brown, however, testified that he could have gained access to the parking lot, if he had wanted.[5]
The trial judge found that Dickie's suffered a loss of business profits as a result of the public work and that, under LSA-Const. Art. 1, § 4, the Department is liable to Dickie's. We disagree.
Although the record clearly reflects that access to Dickie's was somewhat limited by the Department in the exercise of its police power in constructing Project No. 56-06-47, the Department did not substantially interfere with Dickie's constitutional right of access. Dickie's own actions in erecting barricades to restrict the use of its parking lot as a thoroughfare did more to interfere with access to the property than did the actions of the Department. Dickie's has failed to factually show a substantial interference of its access rights by the defendants. The trial court's factual finding to the contrary is clearly wrong.

DAMAGES FOR TRESPASS
Boh Brothers contends that plaintiff failed to establish that a trespass was committed directly by Boh Brothers and, for that reason, it is not liable to plaintiff.
Plaintiff bases its claim for trespass against defendants on its allegations that, during construction, employees of Boh Brothers and/or the Department drove or parked their automobiles and heavy equipment on Dickie's parking lot. Plaintiff reasons that these trespasses substantially contributed to its loss of profits.
To constitute a trespass (a tort) there must be an unlawful physical invasion of the property or possession of another. Gliptis v. Fifteen Oil Co., 204 La. 896, 16 So.2d 471 (1943); M & A Farms, Ltd. v. Town of Ville Platte, 422 So.2d 708 (La. *751 App. 3rd Cir.1982); Patin v. Stockstill, 315 So.2d 868 (La.App. 1st Cir.1975).
In the case sub judice, the trial court found as follows:
[T]here is substantial testimony which leads this court to the conclusion that there were numerous encroachments on Dickie's private property and that these encroachments contributed substantially to Dickie's lost profits. Both Noland Brown and Judy Hunter McGee testified that the presence of equipment and cars in the parking lot made entrance and exit difficult. Jules Thibodaux, a member of the Plaquemine Police Department, testified that he was called several times by Dickie's to ask that equipment and vehicles be removed from the parking lot (TR p. 115). Robert Campos, manager of the Plaquemine store during construction, testified as to problems concerning entrance and exit by customers, problems with workers parking on Dickie's property, and problems with equipment left on Dickie's property (TR ps. 119, 120). Additionally, Jules Vicknair, job superintendent for Boh Brothers during the Plaquemine project, testified that Dickie's had occasionally had to ask Boh Brothers' employees to move vehicles (TR p. 179).
Although we agree with the trial judge that there were numerous encroachments on Dickie's property, the evidence does not establish a causal nexus between the encroachments on Dickie's property and the damage Dickie's claims to have sustained.
In the assessment of damages arising out of trespass, the trial court has much discretion. M & A Farms, Ltd. v. Town of Ville Platte, supra. The damage, however, must be certain, and the discretion exercised only to the extent of the damage and ascertained from all the facts and circumstances. M & A Farms, Ltd. v. Town of Ville Platte, supra; Bentley v. Industrial Fire Protection Co., 338 So.2d 1177 (La.App.2nd Cir.1976).
In the instant case, although Dickie's established that it lost profits during the construction of Project No. 56-06-47, numerous factors contributed to its ultimate loss of profits. Those factors included the usual inconvenience which occurs during highway construction, the trespasses by Boh Brothers, the opening of two new Dickie's stores within five miles of the location on Highway 1, and the erecting of barricades by Dickie's to limit traffic through the parking lot.
Damages must be established with reasonable certainty and considering all the facts and circumstances in the instant case, we simply cannot say that the isolated acts of trespass committed by the employees of Boh Brothers caused the loss of profits suffered by Dickie's. The trial court's ruling to the contrary is clearly wrong.[6]

CONCLUSION
For the above reasons, the judgment of the trial court is reversed, and Dickie's petition is ordered dismissed with prejudice.[7] Dickie's is cast for all costs.
REVERSED.
NOTES
[1] The Department, on appeal, alleges the following assignments of error:

1. The District Court committed legal error in failing to apply the rules of law and jurisprudence from the field of law applicable to claims for damages based on an allegation that said damages were caused by the direct invasion of a legal right of plaintiff by actions of defendants independent of contract, such pleading of fact being within the definition, intent and scope of a tort as defined in Black's Law Dictionary, 4th Ed. and within the intent and scope of LSA-C.C., Art. 2316 and jurisprudence thereunder, and said legal error directly resulted in at least four other legal errors, being:
a. The error of holding the state liable for damages, without evidence that any of the state's employees had committed any tortious act, by the erroneous application legal principles which, if otherwise valid, were not applicable to a suit sounding in tort;
b. The error of refusing to give the state relief under the hold-harmless promise and bond of the contractor in the same contract wherein the contractor acknowledged caution to keep off private property;
c. The error of failing to hold, in the alternative that the state acted together with the contractor or separately to cause the single injury of loss of profits, that the state was a joint tort-feasor entitled to contribution; and
d. The error of awarding plaintiff attorney's fees when there is no authority to award attorney's fees to a plaintiff in tort.
2. In the alternative that this should not be considered a case in tort, the District Court, nevertheless, committed legal error by reversing its earlier holding that plaintiff's business property rights were not protected by LSA-Const., Art. 1, Sec. 4, which legal error resulted from the manifest error of fact in changing from a finding that no taking was alleged to a finding that the actual property appropriated was part of the Dickie's tract.
3. In the alternative that this should not be considered a case in tort, the District Court clearly erred in failing to find that the tract to which plaintiff's business component of property rights was appurtenant was separate and apart from any tract from which part was expropriated, which error induced the legal error of refusing to apply the inverse condemnation rule of Reymond v. State, 231 So.2d 375, which rule provides that a landowner from whom no property is expropriated can recover from one exercising power of eminent domain nearby only for physical damage and that only if proved to be special and not suffered by the general public.
In its appeal, Boh Brothers contends that the trial court committed manifest error in concluding that Boh Brothers committed a trespass and was answerable in damages.
Although we will not address each of the appellants' assignments of error individually, the opinion adequately addresses the issues raised.
[2] In answer to the appeal, Dickie's requests that the award of damage by the trial court be increased from $6,638.00 to $109,548.00.

Boh Brothers, in its answer, alleges that the trial court's judgment against Boh Brothers is contrary to the law and evidence and should be reversed.
[3] For an excellent discussion of the property right of access, see the dissenting opinion of Judge Hood in State, Department of Highways v. Smith, 272 So.2d 746 (La.App. 3rd Cir.1972), writ denied and writ not considered, 272 So.2d 696 (La.1973).
[4] Counsel for Dickie's stipulated that if Dale Campos and Betty Castille were called to testify, the substance of their testimony would be the same as Judy Magee's testimony.
[5] Counsel for Dickie's stipulated that if Ledell Wade and Joseph Wade were called to testify, the substance of their testimony would be the same as Noland Brown's testimony.
[6] It also appears that an inverse condemnation cannot be used as a vehicle to recover damages for torts committed by public employees or the employees of contractors doing public work. Torts are not "a necessary consequence of a public undertaking," and, therefore, cannot constitute a taking and/or damaging by the state for a public purpose as is required for an action under LSA-Const. Art. 1, § 4. Angelle v. State, 212 La. 1069, 34 So.2d 321 (1948); Perkins v. Simon, 265 So.2d 804 (La.App.3rd Cir.1972); Miller v. Colonial Pipeline Company, 173 So.2d 840 (La.App.3rd Cir.1965), writs refused, 247 La. 1029, 175 So.2d 644, 645 (1965); M. Miller, Expropriation Compensable Items in Louisiana, 24 La.L.Rev. 849, 864-865 (1964); J. Hebert, Expropriation Consequential Damages Under the Constitution, 19 La.L.Rev. 491, 503-504 (1959). Further, the "damage which is recoverable must be proximately caused by the improvement as designed and constructed or must be the probable, the immediate, the direct, and the necessary result and effect of the activities engaged in during construction." Reymond, 231 So.2d at 384. The trespass torts herein do not fit this requirement.
[7] Because of our rulings on liability, it is unnecessary to pass on the issues of the effect of the release in the voluntary sale, quantum, the Department's third party claims for indemnification and/or contribution and entitlement to attorney's fees.