231 So.2d 375 (1970)
255 La. 425
Mabel M. REYMOND
v.
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS, et al.
No. 49708.
Supreme Court of Louisiana.
January 20, 1970.
Dissenting Opinion February 4, 1970.
Rehearing Denied February 23, 1970.
*378 Philip K. Jones, D. Ross Banister, Norman L. Sisson, Robert J. Jones, Burton, Roberts & Ward, Charles Wm. Roberts, Baton Rouge, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, for appellant.
Ernest A. Carrere, Jr., Patrick W. Browne, Jr., Donald O. Collins, New Orleans, Amicus Curiae.
George Piazza, New Orleans, Amicus Curiae.
Sanders, Miller, Downing & Kean, R. Gordon Kean, Jr., Baton Rouge, for appellee.
BARHAM, Justice.
The present action came about as a result of the Department of Highway's construction of Interstate 10 through Baton Rouge. Mrs. Mabel M. Reymond, alleging several claims for damages on alternative grounds, instituted suit against the State of Louisiana through the Department of Highways and its contractor, Fruin-Colnon Contracting Company. The Department named Fruin-Colnon a third party defendant, and it in turn filed a third party proceeding against Raymond International, Inc., its subcontractor.
The construction of Interstate 10 required the building of a multi-lane elevated controlled-access highway over and across a portion of Eugene Street. The Highway Department contracted with Fruin-Colnon to perform this part of the project, and it subcontracted to Raymond International the driving of piling. Before this construction Eugene Street ran in front of a number of houses to a dead end one house beyond the plaintiff's home. Although several pieces of property fronting on Eugene Street were expropriated, the plaintiff's property and that of some of her neighbors were not taken. The construction, however, required that the street be rerouted so as to give access to the plaintiff's residence and other property by *379 curving under Interstate 10 to the dead end.
Plaintiff contended that because of this construction she has been denied easy and direct access to her property, that her view and her prospect are impaired, that her residence is separated from a large portion of a subdivision, and that she must suffer the noise of heavy traffic. She also alleged that there was structural damage to her house, such as uneven floors, cracks in ceilings, separation of walls, and general damage in the form of cracking and misalignment. It was alleged that this structural damage was caused by the pile driving done in connection with the construction of Interstate 10.[1]
The trial court dismissed the claim against Fruin-Colnon and Raymond, but cast the Department of Highways for $8750.00 with legal interest from date of demand until paid. This judgment included $6250.00 as "severance or consequential damages" awarded under Article 1, Section 2, of the Constitution, or, as the trial judge said in his reasons for judgment, "special damages which were not related or common to those shared by other property in the neighborhood and for which compensation in the form of consequential damages should be allowed". The remainder of the judgment, $2500.00, was awarded for structural damage to the plaintiff's house, on the theory that "the construction of the Interstate contributed substantially to the structural damage of the Reymond home", and that this damage was recoverable under Civil Code Article 667.
The Court of Appeal affirmed the judgment of the lower court and approved the reasoning which formed the bases for both amounts awarded. 217 So.2d 488. Certiorari was granted on application of the Department of Highways.
One of the primary reasons for granting a writ in this case was to clear up the confusion in the appellate jurisprudence as to whether the Department of Highways is immune from suit. Since the granting of this writ, however, this court has passed upon that question in relation to a suit in tort. In Herrin v. Perry and Perry v. Herrin, decided November 10, 1969, 254 La. 933, 228 So.2d 649, we held that under Article 3, Section 35, of the Constitution the clause to "sue and be sued" of R.S. 48:22 effectuates a general waiver of the immunity from suit formerly enjoyed by the Highway Department.
Contrary to the argument of the Department of Highways, we have never held that the phrase to "sue and be sued" was to be considered as a waiver of immunity from suit and liability in actions in contract only and not in other actions.[2] The Department of Highways has also urged that the only purpose of the 1960 amendment to Article 3, Section 35, of the Louisiana Constitution was to nullify the effect of Duree v. Maryland Casualty Co., 238 La. 166, 114 So.2d 594, and Stephens v. Natchitoches Parish School Board, 238 La. 388, 115 So.2d 793, which had differentiated between waiver of immunity from suit and waiver of immunity from liability. We find no merit *380 in the contention that the amendment should be so limited in construction.
The doctrine of governmental immunity in Louisiana is not an affirmative constitutional guarantee. It originated as a jurisprudential legal principle, and the very amendment which in broad terms waives this immunity is the only constitutional expression concerning this jurisprudentially created doctrine. As we noted in Hamilton v. City of Shreveport, 247 La. 784, 174 So. 2d 529, the scope of this amendment cannot be limited by this court since it is clear and precise in its wording. It enumerates all of the governmental bodies that are to be affected, and makes the waiver of their immunity from suit and liability "* * * for all purposes * * *" all-inclusive. We hold here that the Department of Highways has waived all immunity from suit and liability.[3]
Recovery for structural damages to plaintiff's home is sought under several theories, one of which is that each of the defendants was negligent. Both the trial court and the Court of Appeal held that plaintiff had failed to prove negligence in any respect, and since our study of the record leads us to a similar finding, we conclude that there is no liability on the part of any of the defendants on the ground of negligence.
In one alternative argument plaintiff has urged that under Civil Code Article 667 she is entitled to recover from the Department of Highways for the structural damage, and though we reject the applicability of this article and apply other law to the case, we must pass upon this argument, for the measure of damages under this theory is not the same as the measure of damages under the applicable law.
Both courts below granted damage under Article 667, apparently assuming as have many juristis and writers that it imposes strict liability upon one who acts on his own property to the damage of his neighbor. The courts of this state have floundered from one theory to another to no theory at all in determining the right to recover for damages caused to neighboring property by a hazardous or unusual activity or by the use of a dangerous instrumentality or material. Recovery has been predicated upon negligence, upon a common law theory of nuisance, upon the common law theory of strict liability when one engages in hazardous activity, and upon the theory of limitation of right of ownership, and has even been allowed without a mentioned theory or authority. Sometimes Article 667 was cited in conjunction with the theory and sometimes not. This fluctuation has often been noted by commentators in our law reviews with criticism of one theory or another, but the results reached in the cases allowing recovery under these theories have been generally approved.
The position of Article 667 and related articles in the Code, their source and history, and the development or changes in application of the articles are important considerations for their interpretation and application.
Civil Code Articles 666-668 are found under the title "Of Predial Servitudes or Servitudes of Land" in the chapter "Of Servitudes Imposed by Law". The first clause of Article 666 is a literal translation of its source, Article 651 of the Code Napoleon: "The law imposes upon the proprietors various obligations towards one another, independent of all agreements." And we have added: "* * * and those are the obligations which are prescribed in the following articles." Articles 667 and 668 have no specific counterparts in the Code Napoleon but are derived from Domat, Oeuvres completes de J. Domat, Book *381 1, Title 12, Section 2, Nos. 8 and 9, p. 333 (ed Remy 1835).[4] Articles 667 and 668 read as follows:
"Art. 667. Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
"Art. 668. Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
"Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage." (Emphasis supplied.)
Article 667 is a verbatim translation of No. 8 of Domat's work, supra, without his explanatory and indicative illustrations. Domat's illustrations in No. 8 of the meaning and application of this legal principle are: Thus one cannot raise a building on his estate, the roof of which would discharge water upon his neighbor's estate. One cannot make a planting or a building without observing certain distances from the confines of his estate. One cannot make constructions, such as an oven or a bakehouse, against a wall, common or other, which may be a hazard or cause damage to the wall.
The English word "work" in Article 667 is a translation of the French "ouvrage" used in Domat's No. 8, and both can mean either "labor" or "construction, structure, or building". In the light of the examples given by Domat in his discussion of the law which became the source of our Article 667, it is clear that "ouvrage" and "work" mean "construction". Furthermore, our use of the combination of words "make any work" not only connotes but denotes the meaning "construction" or "building".
Thus Article 667 prohibits a proprietor of an estate from constructing and keeping buildings, edifices, structures, levees, and other such works upon his estate which do damage to a neighbor or deprive the neighbor of the facility of enjoying his own estate. The article is applicable only to structural changes in or on the land, and it is the existence of the thing, the construction, or the change upon the estate which must give rise to the damage.
We have omitted Domat's illustrations from our Civil Code Article 667, but our versions of these illustrations are expressed in other articles defining servitudes of law. Article 698 controls the discharge of water from the roof of a building, Article 691 deals with planting on boundary lines, Article 697 concerns buildings on boundary lines, and Article 692 provides the regulations for digging wells and privies and for building chimneys, ovens, etc. Thus our present Civil Code, like our earlier Codes and like the Code Napoleon, has recognized the particular servitudes which were given as examples by Domat.[5]
Our Article 667 as modified by Article 668 either creates a veritable predial *382 servitude and is a "catch-all" for any possible omissions from the later articles prescribing particular servitudes of law, or is a general statement of the principle of law forming the basis of certain particular servitudes which are thereafter enumerated. Whether it establishes a true servitude or states the general principle concerning servitudes of law so as to serve as an introduction and explanation of such servitudes, it is a law of property and is inapplicable to the activities of man. Man's activities are not the subject of predial servitudes, for it is an estate and not man which is subservient to a servitude.[6] The redress which the article affords, if any, exists only in favor of a proprietor and then only against the proprietor of a nearby estate for construction or plantings upon that estate which by their very existence deprive the former of the use and enjoyment of his property or which cause him damage. The fact that jurisprudence of this court and of the Courts of Appeal has fallaciously interpreted and applied Article 667 for many years is no reason for this court to disregard the positive meaning, clearly expressed, of that statement of law and the only results which could have been intended.'[7]
*383 We do not overrule the jurisprudence which has allowed recovery for damages resulting from the use of dangerous instrumentalities and materials or man's engagement in inherently hazardous activities. We simply find Article 667 inapplicable in such situations. We need not and do not state the basis, authority, or source for recovery in cases of this nature. In the particular case before us the damage complained of by plaintiff arose out of and in connection with a public body's exercise of eminent domain, and the recovery against this defendant, which plaintiff seeks in an alternative plea, is provided in special constitutional and statutory provisions for the exercise of the right of eminent domain.
Article 1, Section 2, of the Louisiana Constitution reads in part: "* * * Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." (See also Article 4, Section 15.) Sections 19 and 19.1 of Article 6 authorize the Legislature to define the Department of Highways' exercise of eminent domain, and under the authority of R.S. 48:441 et seq. the Department has expropriated property for Interstate 10 in the vicinity of plaintiff's property. Since a taking or damaging of property may in fact occur without expropriation proceedings by a public body through oversight or lack of foresight, there must be some proceeding whereby an owner may seek redress when his property is damaged or taken without the proper exercise of eminent domain. Such an action is often referred to as "inverse condemnation", and our Article 1, Section 2, and Article 4, Section 15, support a proceeding in the nature of inverse condemnation by such an affected property owner.
The liability of a public body for property taken or damaged but not included within its actual expropriation activity must be limited to those instances where there is a physical taking or damage to that property or a special damage peculiar to the particular property and not general damage sustained by other property similarly located. Both courts below allowed the plaintiff to recover special damages under Article 1, Section 2, of the Constitution because her house, along with three others, was severed from the rest of the subdivision, her ingress and egress were made somewhat circuitous with resulting confusion and difficulty in finding her residence, her view was impaired, and she had to endure the noise of heavy traffic. The testimony[8] and the pictures, maps, and other exhibits offered in evidence bring us to the following factual conclusions. Interstate 10 is elevated near plaintiff's house with Eugene Street rerouted by a slight curve so as to come under the overhead structure and reach the houses of the plaintiff and her neighbors. Eugene Street was a dead-end street one house beyond the plaintiff's home before the construction of Interstate 10, and it remains so. The access to plaintiff's house has not been cut off, but has been made only slightly more circuitous. Plaintiff will now suffer the noise of traffic, and her surroundings are not so lovely to view.
The criterion for assessing the special damage suffered by a property owner because of the construction of a public *384 project under eminent domain is whether that damage is not suffered by those in the general neighborhoodthat is, whether the damage is peculiar to the individual who complains. In this case the effect of the construction is not limited to the neighborhood, or even to plaintiff and her three neighbors, and certainly not to the plaintiff alone. All the owners of such property, like the plaintiff here, must suffer the noise of traffic and must view less pleasant surroundings. In the metropolitan areas through which Interstate 10 passes, literally hundreds of houses which once had ingress and egress by direct routing of streets are now situated below elevated multi-lane highways and are reached by circuitous or more inconvenient routes. These are not in themselves special damages; they have not been and are not recoverable. Patin v. City of New Orleans, 223 La. 703, 66 So.2d 616; Thomas & Warner, Inc. v. City of New Orleans, 230 La. 1024, 89 So.2d 885; Rudolph Ramelli, Inc. v. City of New Orleans, 233 La. 291, 96 So.2d 572; Cerniglia v. City of New Orleans, 234 La. 730, 101 So.2d 218.[9] Even when, as in the instant case, an actual diminution in market value of the property is found to exist because of these factors, this diminution is not compensable. Damages which cause discomfort, disturbance, inconvenience, and even sometimes financial loss as an ordinary and general consequence of public improvements are not compensable, and are considered damnum absque injuria.
The damage which a property owner may claim against one exercising the power of eminent domain would exclude non-physical damage, and the physical damage which is recoverable must be proximately caused by the improvement as designed and constructed or must be the probable, the immediate, the direct, and the necessary result and effect of the activities engaged in during construction, in short, compensable physical damage to adjacent property is restricted to that which is actually a consequence of the activity complained of.
Both the trial court and the Court of Appeal found that there was structural damage to plaintiff's residence, which was located approximately 100 feet from the pile driving activity, and that the structural defects were caused by vibration from that activity. The trial court weighed the evidence, assessed the credibility of the witnesses, and balanced the effect of the expert testimony. From an independent study of the record we cannot say that the trial court and the appellate court have manifestly erred in finding that the plaintiff has discharged the burden of proving that the structural damage to her residence was caused by the pile driving activity during the construction carried on by the Department of Highways. In such cases as this, proof of the causative factor is subject to the same standard as proof of negligence in a delictual action. Damage and causation are the necessary prerequisites for recovery, and they must be affirmatively shown by a preponderance of the evidence. We conclude that the plaintiff should recover for the structural damage to her house.
Having found that the plaintiff should recover for structural damage to her house, we are required to assess this damage. The trial court judgment for $2500.00 for structural damage, affirmed by the Court of Appeal, was awarded on the basis of an estimate of cost of repair. This is not the usual criterion for computing damages in expropriation cases whether in condemnation or inverse condemnation. Ordinarily the measure of damages in expropriation proceedings is the difference in the *385 market value of the property before and after the damaging or taking. Only recently we have criticized the so-called cost-tocure concept in measuring damages in expropriation proceedings. We recognized the "before and after" rule to be the generally acceptable rule in this jurisdiction for assessing damages, and stated that other approaches may be used only in special or unique situations. State through Department of Highways v. Mason, decided November 10, 1969, 254 La. 1035, 229 So.2d 89.
The difficulty presented here is that expert witnesses have testified to a diminished market value for plaintiff's property and assessed that diminution upon factors which we have found not to be compensable. However, none of these witnesses attack the problem of the effect of the structural defects in the house upon the market value of the subject property. We cannot even ascertain whether they considered these defects in assigning their before and after values. It appears that utilization of the before and after market value approach to ascertain compensable damages because of structural defects in the house itself would be impossible when so many other factors, although not compensable, have in varying and unknown degrees contributed to the diminution in market value of the whole property. An attempt to fix damages under such an approach would partake of mere conjecture and speculation requiring the assignment of percentages of diminution in value attributable to the many factors.
We find that under the circumstances the most accurate reflection of the diminished market value resulting from structural defects alone would be that value assigned, and not refuted, as the minimum expenditure for the repair of cracks, separation of walls and of door and window facings, and the realignment and repair of the structural timbers. We are compelled to find under the circumstances, facts, and conditions existing here that the estimate of repair should be equated to the differential in market value resulting from defects in the house alone. We are cognizant that any buyer would contemplate the necessity for correction of such defects as are so apparent in this house, and that the actual cost of the necessary repairs would be reflected in the purchase price. The prayer of plaintiff's petition and the evidence in the record are sufficient to encompass a determination of damages on this basis.
Argument is made that the Department of Highways may not be assessed with costs in this proceeding. However, we have made an award to plaintiff for damages caused by the Department in its exercise of its right of eminent domain, and it may be cast for costs in connection with those damages.
The judgments of the district court and the Court of Appeal are amended. The award of $6250.00 for diminution in value caused by impaired accessibility, discomfort, and disturbance and the award of expert witness fees to Mr. Perkins, whose testimony was designed only to establish that diminution in value, are set aside. The award of $2500.00 for diminution in market value of plaintiff's residence by reason of structural damage attributable to vibration from pile driving activity and the awards of witness fees to Mr. Bowman and Mr. Kidd of $50.00 each are affirmed. These witness fees and other costs are cast against the State of Louisiana through the Department of Highways. As thus amended the judgments are affirmed.
HAMITER, J., concurs in the result.
HAMLIN, Justice (dissenting in part and concurring in part).
I respectfully dissent from that part of the majority opinion which reversed the judgment of the Court of Appeal insofar as it allowed Mrs. Mabel M. Reymond $6,250.00 as consequential damages for diminution in value to her property and awarded Verdie Reese Perkins expert witness fees for his testimony with respect to such diminution.
*386 The majority opinion recites the facts of this matter; repetition is not necessary. The Court of Appeal quoted in great part the reasons for judgment of the trial court. I am in complete accord with the trial court's findings with respect to the consequential damages suffered by plaintiff; they recite in part:
"It appears that Mrs. Reymond purchased her residence at 3464 South Eugene Street in October of 1956 for $9,925.00. Her dwelling was described as being a `modest five-room residence of frame construction,' approximately 15 to 18 years old and situated on a residential lot of approximately 60 feet frontage. Originally, before the construction of the Interstate, the house was located in a well established subdivision of comparable or better class residences.
"Sometime in 1962, development of the Interstate commenced. Construction followed the expropriation and removal of the residences in the area. The Interstate did not take any of Mrs. Reymond's property; however, it did take all of the residential property across the street from her house. In addition, the Interstate was constructed at such an angle that Eugene Street had to be rerouted, and while Mrs. Reymond's property still faces Eugene Street, it has obviously been separated and isolated from the remaining portion of the subdivision and neighborhood. There are three other residences on the same side of the street as Mrs. Reymond's that share a similar fate.
* * *
"Turning to the situation at hand, it is obvious that the property of Mrs. Reymond has not only been isolated by the construction of the raised portion of the Interstate, but a peculiar problem has been presented relative to the property's accessibility. It is apparent from a physical inspection of the location, as well as from the exhibits in the record, that four residences (including that of Mrs. Reymond) have been completely severed from the balance of the subdivision. Further, it is evident from the testimony of the witnesses that confusion exists in locating this portion of Eugene Street southeast of the pillars of the Interstate. A good indication of this situation is shown in Exhibit P-4 where the street sign itself leads an inquirer to believe that the portion of the street leading under the pillars of the Interstate is actually Honeysuckle Avenue instead of Eugene Street. Mrs. Reymond strengthens this observation when she related that delivery and service people had difficulty in finding her residence due to the situation. Inasmuch as only three other residences share these problems created by the construction of the Interstate, the Court finds that Mrs. Reymond's property indeed suffered such special damages which were not related or common to those shared by other property in the neighborhood and for which compensation in the form of consequential damages should be allowed. "* * *
"Mr. Verdie Reese Perkins, a real estate appraiser with a wealth of experience in the field, testified that he was personally acquainted with Mrs. Reymond's property before and after the Interstate was constructed. He estimated the value of Mrs. Reymond's property immediately before construction in 1962 at $12,250.00. His estimate of its value after construction was $6,000.00, therefore, a diminution or loss in value of $6,250.00. He described as being important factors influencing the value downward as: 1) Accessibility, 2) noise of Interstate, 3) view, 4) desirability, and 5) separation from the remainder of the neighborhood. To sum it up, he said `It is just not a desirable piece of property now.' Mr. Perkins used the market data approach in placing a value on the property and specifically offered as a comparable the sale of an `identical home' next door in 1966 for the price of $5,900.00.

*387 "Mr. Karl Snyder, also an experienced real estate appraiser testified concerning a report he had made in connection with an appraisal of the plaintiff's house and lot. He acknowledged also that certain factors presented by the property's `proximity' to the Interstate caused some depreciation. However, he was of the opinion that the improvement of the street with curb and gutter was a balancing factor against this lessening of value. He followed both the `cost' and `market' approach in seeking a value for the property when he made his report in 1967. He said the market approach utilizing comparables was the most reliable and on that basis he arrived at a value of $7,500.00. However, Mr. Snyder used the figure of $7,600.00 derived from his `cost' approach evaluation to show a loss in value of $2,400.00, being the difference between what the property was worth without the factor of the Interstate and what it is worth as is.
"While the Court recognizes Mr. Snyder's ability and the features of his appraisal upon which he based his opinion, it must be noted that Mr. Snyder admitted that he made no estimate of the value of the property before construction as did Mr. Perkins. In order to apply the recognized rule for severance and consequential damages, it is necessary that the appraisers determine the value of the property before the taking, and in this case Mr. Snyder did not do so. Accordingly, the Court must give controlling weight to the opinion and findings of Mr. Verdie Reese Perkins, whose estimate as to the severance or consequential damages was in the amount of $6,250.00."
In the case of Jarnagin v. Louisiana Highway Commission, 5 So.2d 660, the Court of Appeal stated:
"We are of the opinion that a physical invasion of real property or of a real right is not indispensable to the infliction of damages within the meaning of the constitutional guaranty under discussion. If the public improvement, as a consequential effect, has caused special damage to property, such as is not sustained by the public or the neighborhood generally, whether it abuts the improvement or not, an action lies to recover. This is true although the improvement be made by an agency having lawful authority so to do. * * *"
In a later case, Central Louisiana Electric Co. v. Harang, 131 So.2d 398, the Court of Appeal stated:
"It has been held that consequential injuries to the owner resulting from discomfort, inconvenience or loss of business are damnum absque injuria and not compensable, American Tel. & Tel. Co. of Louisiana v. Maguire, 219 La. 740, 54 So.2d 4; Louisiana Highway Commission v. Boudreaux, 19 La.App. 98, 139 So. 521, supra; State v. Sauls, 234 La. 241, 99 So.2d 97, unless such inconvenience caused the landowner diminishes the market value of the land not taken. Louisiana Highway Commission v. Guidry, 176 La. 389, 146 So. 1; Opelousas, Gulf & N.E. Ry. Co. v. St. Landry Cotton Oil Co., 121 La. 796, 46 So. 810."
The majority opinion has correctly stated the law to be as follows:
"The criterion for assessing the special damage suffered by a property owner because of the construction of a public project under eminent domain is whether that damage is not suffered by those in the general neighborhoodthat is, whether the damage is peculiar to the individual who complains. * * *
"The damage which a property owner may claim against one exercising the power of eminent domain would exclude non-physical damage, and the physical damage which is recoverable must be proximately caused by the improvement as designed and constructed or must be the probable, the immediate, the direct, and the necessary result and effect of the activities engaged in during construction. In short, compensable physical damage to adjacent property is restricted to that *388 which is actually a consequence of the activity complained of."
The majority opinion has found that plaintiff's damages are damnum absque injuria. The writer believes that this conclusion is erroneous, and that the following findings of fact by the majority opinion are also incorrect:
"In this case the effect of the construction is not limited to the neighborhood, or even to plaintiff and her three neighbors, and certainly not to the plaintiff alone. All the owners of such property, like the plaintiff here, must suffer the noise of traffic and must view less pleasant surroundings."
These findings are contrary to those found by the trial judge who saw and heard the witnesses and who was familiar with the locale of the plaintiff's property and its proximity to Interstate 10. The findings are also contrary to those of the Court of Appeal. That Court stated:
"Considering the evidence produced as to the accessibility of the Reymond home prior to and subsequent to the construction of Interstate 10, we certainly feel that special damages were caused petitioner which damages are recoverable under the provisions of Article 1, Section 2 of the Constitution. Certainly the damages to her property due to the location of the Interstate Highway cannot be considered general damages as were suffered by other residents of the whole subdivision or neighborhood."
Article I, Section 2, of the Louisiana Constitution of 1921, provides:
"No person shall be deprived of life, liberty or property, except by due process of law. Except as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid."
If public improvements, as consequential effects, have caused special damage to property such as is not sustained by the public or neighborhood generally, compensation is recoverable. State, Through Department of Highways v. Terry, La.App., 194 So.2d 144. The only damage that is compensable is a special damage to the owner with respect to his property, resulting in its depreciation in value, in excess of that sustained by the public generally. It must be different in kind from that suffered by all other property in the locality or neighborhood. The measure of the compensation payable is the diminution in the property's value for sale and rental. Carter v. Louisiana Highway Commission, La. App., 6 So.2d 159. See, Cucurullo v. City of New Orleans, 229 La. 463, 86 So.2d 103.
From the above quoted facts, I find that the plaintiff suffered physical and consequential damages, and that such damages were proximately caused by the construction of Interstate 10. I also find that she has suffered a substantial diminution in the value of her property. This fact was affirmed by Verdie Reese Perkins whose testimony was knowledgeable, expert, and clear. Mr. Perkins' testimony was more detailed than that of the expert witness of the defendant State of Louisiana, Through the Department of Highways, and was based on a greater number of estimates. Plaintiff's damage was consequential, physical, and peculiar as to her; it was not the type sustained by the public or the neighborhood in general.
Under Article I, Section 2, Louisiana Constitution of 1921, the authorities above cited and quoted, and the facts and circumstances of this case, plaintiff is entitled to compensation for the damages she has suffered. The amount of $6,250.00 found to be just compensation by the trial court and by the Court of Appeal is, in the writer's opinion, adequate. It follows that plaintiff's expert witness is entitled to fees for the testimony he gave during trial.
While I appreciate the time and effort expended in connection with the affirmance in part of the judgment of the Court of *389 Appeal by the majority opinion, I can only concur in this Court's decree which affirmed in part the Court of Appeal's judgment. I do not believe that the discussion of Article 667 of the Revised Civil Code in the majority opinion was necessary to a decision in the instant matter.
For the above reasons, I respectfully dissent in part and concur in part with the majority decree of this Court.
SUMMERS, Justice (dissenting).
I concur in the result reached by the Court in awarding $2,500 to Mrs. Reymond for the structural damage to her house. Otherwise I respectfully dissent from the Court's disposition of the other issues presented.
In refusing to allow consequential damages to Mrs. Reymond, the majority has taken a narrow and oppressive view of the constitutionally guaranteed right of a private citizen to be adequately compensated for property "damaged" for a public purpose. La.Const. art. 1, § 2. Applying the doctrine of damnum absque injuria to the facts of this case amounts to an extension of a jurisprudential rule of doubtful validity in order to defeat a constitutional guarantee of a fundamental character.
There is no mystery in Section 2 of Article I of the Constitution when it declares that "private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid." The evidence in this case amply establishes a diminution in value peculiar to Mrs. Reymond's property and that of her immediate neighbors. It is not the kind of damage contemplated by those cases which deny compensation to property owners who suffer damages which are essentially only inconvenience incurred by all property owners in an extensive general neighborhood or area. In fact, in Cerniglia v. City of New Orleans, 234 La. 730, 101 So.2d 218 (1959), cited in the majority opinion, where a route change in a street affected the owner's property differently from the neighborhood generally, the Court allowed damages and refused to apply the doctrine of damnum absque injuria in all respects. Likewise in Rudolph Ramelli, Inc., v. City of New Orleans, 233 La. 291, 96 So.2d 572 (1957), the Court found the inconvenience "common to all other property owners within the same vicinity." The Ramelli case is therefore not authority for denying compensation in the case at bar where the damage is peculiar to Mrs. Reymond and those immediately surrounding her and not the public generally.
In my view, therefore, the diminution in value to Mrs. Reymond's property falls squarely within the spirit, the letter and the intendment of Section 2 of Article I of the Constitution. Her property has been "damaged" for a public purpose, and she is entitled to the just and adequate compensation in the amount of $6,250 which this Court denies her.
SANDERS, Justice (dissenting).
I concur in the award for structural damage. In all other respects I record my dissent.
Under Article I, Section 2 of the Louisiana Constitution, the test for recovery of damages when there has been no physical invasion of the property is whether the damages to the owners are special, as distinguished from those suffered by the public generally. See Harrison v. Louisiana Highway Commission, 191 La. 839, 186 So. 354; McMahon v. St. Louis, A. & T.R. Co., 41 La.Ann. 827, 6 So. 640; State, Through Department of Highways v. Terry, La.App., 194 So.2d 144; Jarnagin v. Louisiana Highway Commission, La. App., 5 So.2d 660.
Contrary to the factual findings of the majority, the record reflects that the Interstate Highway construction completely eliminated that portion of Eugene Street north of the Reymond property. For access *390 to the property, a service road was constructed under the Interstate, forming a cul-de-sac. The Interstate Highway, a wall of concrete higher than the residence and very close to it, left the property physically isolated from the general residential neighborhood.
Both lower courts found the plaintiff had established special damages in that because of limited access and isolation, the market value of the property had depreciated. Two realtors attested to the diminution in value. In fixing the amount at $6,250.00, the courts relied upon the testimony of Mr. Verdie Reece Perkins, a realtor of outstanding reputation and great experience. I concur in this finding.
Although reliance upon Article 667 of the Louisiana Civil Code is unnecessary for recovery in the present case, I must note that the language of the majority opinion unsettles the prior jurisprudence construing this Article. The majority advances the opinion that Article 667 applies only to buildings, edifices, structures, levees, and other structural changes in and on the land that produce damage to the neighbor. It restricts the Article to only one category of estate use, undermining the assumption that the Article serves as a statutory base for the sic utere doctrine.[1] In so doing, the majority repudiates the rationale of the following decisions: Devoke v. Yazoo &, M.V.R. Co., 211 La. 729, 30 So.2d 816 (refueling of locomotives causing smoke); Craig v. Montelepre Realty Co., 252 La. 502, 211 So.2d 627 (pile driving); Gulf Insurance Co. v. Employers Liability Assur. Corp., La.App., 170 So.2d 125 (pile driving); Hauck v. Brunet, La.App., 50 So. 2d 495 (pile driving); Fontenot v. Magnolia Petroleum Company, 227 La. 866, 80 So.2d 845 (subterranean explosion in oil exploration); Wright v. Superior Oil Company, La.App., 138 So.2d 688 (subterranean explosion in oil development); Gotreaux v. Gary, 232 La. 373, 94 So.2d 293 (aerial dusting of crops with insecticides); Trahan v. Bearb, La.App., 138 So.2d 420 (aerial dusting of crops with insecticides).[2] See also Dainow, Property, 21 La.L.Rev. 294-295; Stone, Tort Doctrine in Louisiana: The Obligations of Neighborhood, 40 Tul. L.Rev. 701.
The sole basis for repudiating the rationale of these decisions is the example of "works" given by Domat, a French legal scholar whose writings contributed substantially to the Code Napoleon. It is to be noted, however, that the illustrations used by Domat have been made the subject of specific articles in the Louisiana Civil Code. See LSA-C.C. Arts. 691-698. It seems doubtful that these examples were designed as a limitation upon the neighborhood concept.
Writing in 40 Tul.L.Rev. 701, 705-706, Dr. Stone states:
"It is obvious that the passages cited from the Roman law by Domat list the type of `works' which were the most usual sources of damage to neighbors in that day. Domat himself gives as examples a roof which protrudes over and discharges water upon a neighbor's land, the failure to leave proper distances between structures, the placing of stoves and fireplaces against a common wall; but he quite wisely continues by saying that with regard to those works by which damage might result and which one ought not to be able to do except at a certain distance from the neighbor and with proper precautions, these ought to be governed by rules laid down by the customs and usages of the place. Louisiana has made these more precise by articles 692 through 695.
"The important thing is that these are only illustrations of the type of `works' which at the time of the adoption of the *391 Code could be expected to damage one's neighbor. The listing was never intended to be exclusive. The list grows as the society develops. The world of the Romans or that of Domat did not contemplate the use of dynamite in conducting geophysical explorations, the use of piledriving equipment to prepare a foundation for buildings, the operation of jetplanes over residential areas, the dusting of crops by airplanes, the operation of huge factories, the storing or use of radioactive materials. As man's ingenuity in creating works upon his lands and in conducting operations thereon has increased, so has his capacity to cause harm to his neighbors, with the corresponding necessity for regulation in the interest of the good of all."
Dr. Dainow also writes:
"Article 667 of the Civil Code provides for the legal servitude that one property may not be used in such a way as to cause damage to another. There are also principles of tort law which impose liability on a landowner for damage caused to anothersometimes based on fault or negligence, sometimes as a strict liability. This multiplication of devices permits the court to have a greater range of flexibility in the handling of specific cases and in directing the development of the law concerning responsibility where both damage and causality are proven." [21 La.L.Rev. 294].
For these reasons, I would defer a decision as to Article 667 until its construction is squarely presented. At that time, all prior decisions can be examined. If the conclusion is the same as that suggested in the majority opinion, then the prior decisions should be either reconciled or expressly overruled. In the present case, the Court has merely swept them under the rug.
For the reasons assigned, I respectfully dissent.
HAMLIN, SANDERS, and SUMMERS, JJ., dissent from the refusal of a rehearing in this case.
NOTES
[1] Plaintiff also prayed for damages for mental anguish, disturbance of the natural drain of her property, and disturbance of her access to her property during the construction work itself. These claims were properly rejected by the trial court, were not mentioned by the Court of Appeal, and have not been urged before us.
[2] The cases relied upon by the Department of Highways do not support its position. Fouchaux v. Board of Com'rs (La.App. Orl.1939), 186 So. 103, is a Court of Appeal decision, and when it was later considered by this court, there was no mention of governmental immunity. The statement in Westwego Canal & T. Co. v. Louisiana Highway Com'n, 200 La. 990, 9 So.2d 389, was dictum based upon two Court of Appeal cases. The refusal of a writ in Klein v. Department of Highways (4th Cir. La.App.1965), 175 So. 2d 454, with the comment "The judgment is correct", 248 La. 369, 178 So.2d 658, lends no support since the question of waiver of immunity under Article 3, Section 35, was not urged, the plaintiffs having secured special legislative authority to sue.
[3] See Bazanac v. State of Louisiana, Department of Highways, 255 La. 418, 231 So.2d 373, and Picou v. Department of Highways, 255 La. 422, 231 So.2d 374, which also hold that the Department of Highways has waived immunity from suit and liability.
[4] Also found, in a translation which is not wholly satisfactory, at Sections 1046 and 1047 of Domat, The Civil Law in Its Natural Order (Cushing's ed., Strahan's tr. 1861).
[5] While the Code Napoleon has no article stating the general principle of Domat's No. 8, it does express the examples found there. See Code Napoleon Article 681 (roof drip), Articles 671 et seq. (planting), Article 678 (buildings), and Article 674 (building a stove, oven, or any other work against even a party wall). French jurisprudence has allowed recovery for damage to property in vicinage for unusual exploitation or use of neighboring property without specific codal authority.
[6] We are cognizant that Article 669 has been used by the courts in many instances to define the limits of the activities of man as they affect his neighbors. It provides: "If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place." Since that article has often been treated in parity with Articles 667 and 668, we feel it necessary to say that we conclude that it does not establish a predial servitude under the Louisiana civilian concept. First, by providing redress for those in the same house it would require a servitude on an estate in favor of the same estate. Second, by providing redress for those in neighboring houses it appears to give a cause of action for enforcing its provisions to persons other than the proprietor of an estate. Such results are contrary to our theory that predial servitudes run with the land and in favor of the proprietor of the estate. Article 669 does not create a servitude upon one estate for the benefit of another, but it limits the activities upon and uses of an estate to those which will not cause insufferable inconvenience to others. The restriction here is not upon the construction on or the change in the land as it affects the neighbor, but upon the use to which the land or the construction is put. For example, in the absence of zoning regulations, one may construct and maintain an abattoir if it does not emit noxious odors which the neighbors cannot endure, or one may maintain factories that must consume materials by fire if the use does not cause the emission of noxious smoke which is insufferable to the neighbors. As originally adopted in our law this article (Article 17 of our Code of 1808) not only specifically included "smoke or nauseous smell" but followed Domat by including "the other different inconveniences which one neighbor may cause to another". It is regrettable that our 1825 Code (Article 665) and our present Code omitted "the other different inconveniences". However, jurisprudence appears to have repaired the omission in an expanded version of this article. The fact that Article 669 does not create a servitude has not made it non-functional, for it is a basis and source of our theory of nuisance.
[7] Only last session we applied Article 667 to pile driving activity without dissent, dividing only on the question of whether the action was delictual or contractual. Craig v. Montelepre Realty Co., 252 La. 502, 211 So.2d 627. Professors Wex S. Malone and Joseph Dainow in comments in the Louisiana Law Review and Professor Ferdinand Stone in the Tulane Law Review have discussed the nature of the liability under Article 667 as it has been interpreted by the courts of this state. Professor Dainow has argued strenuously that Article 667 is a law of property and that the action it gives rise to is therefore contractual. Professors Stone and Malone suggest that the recovery which has been had in numerous cases citing Article 667 should have been not in contract but within the fault concept even though the act for which recovery was allowed in not to be condemned morally, ethically, or socially. All have recognized the need for recovery with certain limitations when man engages in hazardous activities to the detriment of an innocent party. We are not here called upon to determine what the remedy is in that situation, but obviously Article 667 does not provide the remedy. It is a law of property and is not delictual under the limited application we attribute to it.
[8] The only witness offered by plaintiff on this element of damage was a real estate appraiser who testified that the curve of Eugene Street made access to her home more circuitous, that the passing traffic was noisy, that the view from her house and of her house was not as pleasant as before the construction and rerouting, and that the market value of her property was diminished for these reasons. Defendants' experts admitted a diminution of $2400,00 in the market value of plaintiff's property after the construction.
[9] The court in Cerniglia recognized the rule of Patin, Thomas & Warner, and Ramelli that circuitousness or mere inconvenience of route is suffered by the public generally and is not compensable; but Cerniglia apparently turned upon a factual finding that the grade level, the peculiar location of plaintiff's property, and other circumstances presented elements of damage not common to other property owners in the area.
[1] So use your own as not to injure another's property.
[2] Only one of these decisions, Craig v. Montelepre Realty Co., was cited in the majority opinion. (Footnote 7.)