SARTAIN, Judge.
Plaintiffs, parents of decedent Michael Gibbens, bring this appeal from judgment rendered against them in favor of defendants, Carroll Edgens, Carroll’s Promotions, Inc., and Hartford Accident & Indemnity Company, dismissing plaintiff’s claim for damages resulting from the death of their fourteen year old son. We affirm for reasons stated herein.
The record before us shows that defendants, Carroll Edgens and Carroll’s Promotions, Inc., are the owners of a race track *794 located in the northern portion of East Baton Rouge Parish near Baker, Louisiana. On August 9, 1973 Edgens was operating a two ton tanker truck insured by defendant Hartford and which was frequently used at the track in spraying oil on the dirt surface to obtain proper soil consistency. Defendant had also allowed three young boys to ride on the truck during these particular oiling operations, two on the outside running board on the passenger side, and the other atop the truck in the “crow’s nest”. The boys played no significant part in the oiling procedure but were members of a group of boys that frequented the track to aid defendant Edgens in various minor tasks. Edgens reciprocated by allowing the boys free admission at the track’s events and performing other favors. On the day of the accident defendant Edgens had allowed the boys to ride on the truck during the oiling process as a “reward” for assistance given him earlier.
Accounts of events leading up to the accident varied, but the evidence is clear that at some point the decedent left his position on the running board of the truck and then attempted to overtake the moving truck, then traveling approximately five miles per hour, from behind and again mount its running board whereupon he slipped and fell beneath the truck’s right rear wheels and died within hours of the incident.
Plaintiffs now contend that defendant Edgens was negligent in allowing decedent to ride on the outside running board of a moving truck. In the alternative, plaintiffs argue under the facts of this case that the court should apply a doctrine of strict liability and impose responsibility on defendant regardless of the conduct of any of the persons involved. With these contentions in mind we look to the evidence.
Defendant Edgens testified that the track is oval in shape and runs north and south in length. On the day of the accident he was spraying the track, proceeding in a counter-clockwise direction. He stated that he stopped in the southeastern turn and let Gibbens off the truck whereupon Gibbens walked across the track to the southwestern turn to converse with Bobby Slaven, Rick Westmoreland and several other persons standing in that area. Defendant then proceeded around the track and as he approached the southwestern turn he noticed Gibbens standing with the aforementioned group. As he traveled past decedent he received no indication that decedent wished to regain his position on the truck. Proceeding through the southwestern and into the southeastern turn, defendant felt a bump and was informed by Terry Baggett, the other boy who occupied a position on the outside running board, that decedent had been run over by the truck. Mr. Edgens estimated that the truck was traveling less than five miles per hour, or the pace of a fast walk, at the time the accident occurred. Defendant Edgens never saw decedent approaching the truck according to his own testimony. When asked if he had given any specific instructions about getting on and off moving vehicles, the following testimony was elicited:
“Q. The — let me ask you this specifically, Mr. Edgens. Have you instructed Mikey and his group of friends, those that came to the race track, with regard to getting on and off of this particular vehicle while it was in motion ?
A. Yes, sir.
Q. What were the instructions specifically that you gave ?
A. Just like I had told them all the time on anything else that we had running, don’t never get off of anything running and don’t never get on anything running, wait until it stops.
Q. To your knowledge had Mikey or any of the other boys ever violated those instructions with you on this piece of equipment?
A. No sir.”
*795 Terry Baggett testified that he and Gib-bens were standing on the running board opposite the driver’s side with himself in front. He stated that the window was down and that they were each holding on to the inside of the door. As the truck approached the southwestern turn and was about to enter the turn, Gibbens jumped off and proceeded to a group standing on the side of the track. The truck made a complete revolution of the track and passed Gibbens. As Baggett glanced back he noticed Gibbens running up to the truck. Baggett testified that he shook his head in a negative fashion to indicate to the approaching Gibbens that he should not attempt to mount the moving vehicle. Bag-gett then turned his attention back to defendant Edgens. He never told Edgens that Gibbens was approaching and when Baggett glanced back to check on Gibbens’ progress, he realized that Gibbens had been run over by the truck. Baggett too estimated the speed of the truck at the time of the accident as equivalent to that of a fast walk. When questioned as to instructions given by defendant Edgens, the following testimony appears:
“Q. O. k. Before you got on the truck did Mr. Edgens instruct you that it was dangerous and that you should be careful?
A. He did.
Q. What did he tell you about it, do you remember exactly?
A. Yes, he said if you get on the truck stay on the truck, if you wanted off to tell him and he would stop and let us off.”
Mike Kippers was also present on the truck at the time of the accident and was riding in the “crow’s nest”. He stated that Gibbens jumped from the truck as it approached the southwestern turn, spoke briefly with a group of people standing there, and immediately ran to catch up with the truck as it completed the southwestern turn. He stated that Gibbens jogged up to the truck on the passenger side, got one foot on the running board and slipped. Kippers, too, remembered Ed-gens’ instructions:
“Q. O. k. Did Mr. Edgens tell you anything about whether or not it was dangerous for you to be riding on the truck and to be careful ?
A. Yes, he told us not to hop off and hop on the truck, if you are going to ride stay on the truck, if you ain’t, stay off.
Q. Now, were there occasions when somebody would get off the truck and get back on ?
A. No, sir, not until we got through running all the oil out and we would hop off and take the things off.
Q. So he never stopped at any point except when he ran out of oil ?
A. No, sir.
Q. How fast was the truck going around the track during the oiling operations ?
A. I don’t know exactly, but it was going real slow—
Q. Could you—
A. —it was idling, just about.
O. Pardon me?
A. Idling, just about.
Q. Could you keep up with the truck by walking?
A. Yes, sir.
Q. Did you at any time get off the truck other than when it was stopped ?
A. No, sir.”
Richard Westmoreland testified at trial that he was among the group standing on *796 the side of the track with whom Gibbens had had the discussion immediately prior to the accident. Westmoreland’s description of the accident was essentially the same as Kippers’, that Gibbens dismounted the truck as it approached the southwest turn, spoke briefly, and then immediately tried to catch up with the vehicle. West-moreland watched Gibbens run back to the truck and saw the boy disappear behind it leaving only his legs viewable from West-moreland’s vantage point. He saw both of the boy’s legs disappear above the level of the bottom of the truck and then saw the boy fall to the track and roll under the truck’s wheels.
“Q. Mr. Westmoreland, when you said that you told him not to get on and off, were you the only one who said to him, ‘Don’t get on and off the truck’ ?
A. No, sir.
Q. Who else said something to him at that time, that is, at the time that he came to talk to you all ?
A. All of us.
Q. Hou did you say it to him ?
A. I told him not to be jumping on and off the truck, he was going to get hurt.
Q. Now, when he turned to run or to jog back out to the truck did you or the others yell after him to stop again or holler after him ?
A. Yes, sir.
Q. Did he heed any of you at all ? Did he stop or appear to stop at all when you hollered after him?
A. No, sir.
Q. When you called to him or hollered to him to stop, did you tell him, ‘Don’t get on the truck’ or words to that effect?
A. Yes, sir.
Q. Do you remember what was said when he came over to where you were standing, what did he say?
A. No, sir.
Q. Do you remember any of that conversation, that is, between — did he enter into a conversation ?
A. Not really, no, sir, he just ran up and I think the first thing that was said was to stop jumping on and off the truck, to the best of my recollection, that’s all that was said concerning, you know, as far as hearing the conversation.
Q. Do you remember which one of the three of you were standing there, if you recall, first told him that? Was it you or one of the others?
A. It was one of the others.
Q. Do you remember which one of the other said that to him ?
A. If I am not mistaken it was Bobby Slaven.
Q. Did he indicate in any way by his action or his words or response, some response to that instruction given by Mr. Slaven, did he acknowledge it in any way or say anything like ‘Mind your own business’ or ‘Yes, I will’ or anything?
A. Not that I remember,-no, sir.”
Bobby Slaven’s statements corroborating the above testimony was as follows:
“Q. After he got off at that location where did he go and what did he do?
A. Well, he came over there where we were and then I asked him to not get on the truck, which was the second time, -and then, you know, not be getting on and off the truck, you know, if he was going to ride, you know, get in the truck and ride, you know, and something like *797 that, I don’t know just the words, you know, I said to him at the time, you know, hut he said something like, ‘O. k.’ or something or the other and then he started down the top of the track on that side, you know, and he went on down there and I hollered at him again, you know, and—
Q. What did you holler at him ?
A. Well, to not get back on the oil truck again, you know, and then right after that, you know, the accident happened.
Q. Do you know whether anyone else in the group that you were standing with said anything to him about getting on or off that truck ?
A. Yes, sir, me and Rick—
“Q. Go ahead and answer, please.
“A. Right, well, me and Rick West-moreland both had told him whenever he got off the truck and come over there, you know, to not be getting on and off the truck and then I was the onliest one that told him whenever he went down the track, I think I was, it has been so long ago it is hard to remember, you know, but we were asking him not to get back on the truck, you know.
Q. As he went down the track or around the track could you tell whether he walked or ran or jogged or how did he proceed down the track ?
A. Well, he was running.”
We conclude, as did the trial judge, that the testimony in the record is to the effect that adequate warning had been given to young Gibbens to apprise him of the inherent dangers in mounting and dismounting a moving vehicle. Under these circumstances the trial judge was correct in not holding Edgens guilty of negligence.
Assuming, arguendo, that the question of Edgen’s negligence is debatable, we quote with approval that portion of the district judge’s written reasons for judgment relating to defendant’s plea of contributory negligence on the part of young Mike Gib-bens, to-wit:
“While the Court does not find any fault assessable Edgens, it must comment that it would be difficult to conceive of a stronger case of contributory negligence than the one presented herein. Mike Gibbens was not a child as counsel for the plaintiff wishes to have the Court believe. Rather, he was fourteen years of age and of reasonably average intelligence. Consequently, he possessed the ability to be aware of ordinary risks and accept responsibility for his failure to discern obvious dangers. In view of the fact that he had been adequately warned not to do the very thing which precipitated his accident, there can be no question but that the plea of contributory negligence must be accepted as a valid assertion.”
On the issue of strict liability, the trial judge stated:
“While submitted under an alternative plea, it is evident from his brief that the ‘heart and soul’ of plaintiffs’ argument for recovery is predicated upon the doctrine of strict liability. There can be no question that, as evidenced by the recent jurisprudence, the majority on the Louisiana Supreme Court is moving toward strict liability and expanding its application. In this vein are Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971); Reymond v. State Department of Highways, [255 La. 425, 231 So.2d 375] supra; and Theriot v. Transit Casualty Company, 263 La. 106, 267 So.2d 211 (1972).
*798 Generally, in the past, the courts have restricted the imposition of strict liability to those cases where the defendant was conducting an ‘ultrahazardous activity’, which foreseeably could result in the kind of injury complained of. In Lan-glois for instance, the defendant permitted poisonous gas to escape from its plant and injured the plaintiff who had answered a call at the adjoining property in the exercise of his duties as a fireman. Obviously the inherent properties of poisonous gas cause its use to be ul-trahazardous and the injury to the plaintiff was exactly the kind which could be anticipated in the event of its misuse. In Reymond, the defendants were held liable for damages to plaintiff’s home resulting from the use of a pile driver being operated on adjoining property by the defendants in a highway construction project. There is little question but that a pile driving machine, used in close proximity to adjacent structures, could be considered as a ultrahazardous activity insofar as posing a possible risk to adjoining property.
“It therefore appears to the Court that, at this stage in jurisprudential time, strict liability plays no part in the case where the instrumentality causing the injury is not inherently ultrahazardous. Of course, any piece of equipment, depending upon the manner of its use and operation, can become ultrahazardous, but it is difficult to assume that within normal operation, a motor vehicle falls in the category of an ultrahazardous instrumentality calling for the application of strict liability. Further, the application of strict liability should be sparingly imposed when the complaining party knowingly and actively brings about his own injury. In fact, the writer finds the use of strict liability most appropriate where an innocent bystander is injured. See Theriot, supra. In those cases, he did not put into motion any forces contributing to his injury and, consequently, should be entitled to recover damages. The Court determines, however, that under the prevailing circumstances which exist in this case, the application of strict liability is not appropriate herein.”
We also agree that the facts in the case at bar do not warrant the application of strict liability.
Accordingly, for the above reasons the judgment of the district court is affirmed at plaintiffs’ costs.
AFFIRMED.