244 So.2d 871 (1971)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS
v.
Edmond A. SALASSI.
No. 8162.
Court of Appeal of Louisiana, First Circuit.
February 1, 1971.
Rehearing Denied March 15, 1971.
David M. Ellison, Jr. of Ellison & Gary, Baton Rouge, for appellant.
Johnie E. Branch, Asst. Gen. Counsel, Hwy. Dept., Baton Rouge, for appellee.
Before LANDRY, ELLIS and BLANCHE, JJ.
*872 BLANCHE, Judge.
On July 29, 1966, plaintiff, hereinafter referred to as the "Department," expropriated pursuant to the Louisiana "quicktaking" expropriation statute (LSA-R.S. 48:441, et seq.) 3.53 acres from a 22.49 acre tract owned by defendant, hereinafter referred to as "Landowner." The purpose of the expropriation was to obtain the necessary right of way for construction of a segment of Interstate Highway 12, a controlled-access route running in a generally east-west direction. The aforesaid tract was located east of the Airline Highway in East Baton Rouge Parish and fronted 227.9 feet on the south side of Harrell's Ferry Road. The taking resulted in a division of the original tract with a remainder to the north consisting of 10.614 acres which retained its frontage on Harrell's Ferry Road and a remainder to the south left without any frontage comprised of 8.346 acres. This southern remainder was afforded access, however, by virtue of a service road which was constructed in conjunction with the project. The land involved was unimproved except for fencing.
The Department deposited in the registry of the court the sum of $15,065 representing $10,890 for the 3.53 acres taken and $4,175 for damages to the south remainder. Landowner timely answered the suit seeking an increase in compensation for the part taken and assessment of damages for both the north and south remainders.
At the conclusion of the trial the trial court took the case under advisement and in due course rendered judgment against the Department and in favor of Landowner in the sum of $21,001, subject to a credit in favor of the Department in the sum of $15,065, the sum deposited, with legal interest on the increase from the time of the taking together with an award for costs including expert witness fees. This award consisted of the sum of $12,655 rendered as just compensation for the land taken at the unit rate of $3,500 per acre together with the sum of $300 for expropriated fencing and severance damage in the sum of $8,346 for the south remainder. The trial court held that Landowner sustained no severance damage insofar as the north remainder was concerned. From this judgment, Landowner has appealed. For the reasons hereafter set forth, we affirm the judgment of the trial court.
As evidenced from Landowner's brief and argument, the sole issue presented by this appeal concerns the adequacy of the trial court's award of severance damages to the south remainder. The Department neither appealed nor answered Landowner's appeal, and there is no issue raised concerning the trial judge's award of just compensation for the property and fencing expropriated or for his disallowance of severance damages for the north remainder.
The primary specification of error raised by Landowner concerns the rejection by the trial court of the testimony of Landowner's two expert witnesses who both sought to establish severance damage to the south remainder by resort to the "cost-to-cure" method.
The trial court disposed of this issue in the following manner:
"Turning now to a consideration of the severance damage to the south remainder, we note first that the defendant landowner is provided reasonable access after the taking. We acknowledge that inconvenience, diversion of traffic and change in attending conditions resulted from the taking but, from the evidence, it is not established that these residuals diminish the value of the remainder. Accordingly, they are not proper elements of severance damages nor is the lack of direct highway access. Rudolph Ramelli, Inc. v. City of New Orleans, 233 La. 291, 96 So.2d 572; State, Through the Department of Highways v. Lewis, La.App., 1st Cir., 142 So. 2d 652; and, State, Through Department *873 of Highways v. Elmer Lee Hunt, La.App., 1st Cir., 219 So.2d 602.
"The Department of Highways in this case did not plead nor attempt to prove that the south remainder received any special benefits which could be used as an offset against severance damages. Their appraisers, based on their experience and knowledge as experts, simply placed a value per acre on the remainder which resulted in net damages of $500.00 per acre. However, the landowner took the position that the value of the remainder, for residential development, was worth more per acre immediately after the taking provided the land was `cured' by affording it the same utilities, sewerage and other benefits it enjoyed prior to the taking and which were now lost. Considering the initial value placed on the land as before the taking by Messrs. Lejeune and Williams, their stated increased value after the taking with the same benefits provided, and their stated `cost of cure' or cost of replacing the benefits it enjoyed before the taking, those gentlemen came up with net severance damages greatly in excess of that determined by their opposing colleagues. They cited a comparable, another remainder in the general vicinity, as a basis for their increased value per acre after the taking. Aside from whether their comparable is valid, the Court is faced with deciding which of the two appraisal approaches is more logical for the land in question, i. e., the `cost of cure' approach as opposed to the relatively simple approach of before value based on comparables and after value based on expert opinion. We are attracted by the assertion that remainders along our interstate system are immediately worth more than they were before the `takings' because we are convinced that this is true in many cases with or without regard to the general and/or special benefits that ensue. In this case the benefits relied upon by the defendant as special benefits which increase the value of the south remainder is its increased accessibility and its visibility to expressway motorists before they reach the exit ramp. While it seems refreshing for a landowner to take the position that his remainder is immediately worth more, we are fully cognizant that only an illusion may be created when the cost of cure is considered. For example, this approach could certainly not be used if the cost of cure was so great that it resulted in the Department of Highways paying more in severance damages than it would have cost to take the same land outright.
"In reviewing the testimony of the appraisers who used the cost of cure approach, we have concluded that the comparable used (Blakely to Reiger, et al.) by them to establish the increased value of the south remainder has several characteristics which renders it inappropriate for use in this case. The remainder in question is quite unlike the comparable as regards size, frontage, traffic pattern and adaptability to commercial use. The adjustments which have to be made renders its use here uncertain and speculative in nature and, without a valid basis upon which to assess increased value, the cost of cure approach becomes meaningless. We also point out that if we apply our established value of $3,500.00 per acre for the land before the `taking' instead of the $3,800.00 or $3,950.00 per acre arrived at by these appraisers, a quite different result obtains. Likewise, the net result varies with the allowance or disallowance of the various cost items or any part thereof and in this connection we note that cost items listed by Mr. Lejeune total $29,626.00, not $22,216.00 as testified to by him. This would increase his estimate of severance damage to the south remainder from his stated $13,453.00 to $20,863.00. By comparison, Mr. Williams arrived at severance damages of $24,915.00 for the south remainder. His value per acre after the taking differed *874 from Mr. Lejeune, he listed additional items of cost totaling $8,600.00 and he deleted one of Lejeune's cost items in the amount of $2,211.00. The landowner in this case has not successfully borne the burden of proof with regard to all of the cost items. The $2,211.00 representing interest which would otherwise be earned on monies spent for gas and water utilities before refunds for tie-ins is not subject to computation with any degree of exactness. It was also established to our satisfaction that before the taking only a two inch water line serviced the property and for residential development purposes an eight inch line is necessary. Considering the distances involved, this means that the cost of furnishing water to the south remainder after the taking would not vary a great deal from its cost before the taking thereby nullifying most of this claimed item of cost. We are likewise not convinced that all of the additional cost items related by Mr. Williams are proper. Sound reasoning dictates otherwise. It is interesting to note that if we use Mr. Lejeune's cost items after deleting those for interest and water, apply $3,500.00 as the value before the taking and $5,000.00 as the value after the taking, we arrive at net damages of $8,056.00 which is approximately the same figure resulting from an application of the other approach assuming the same before value of $3,500.00 and an after value of $2,500.00 per acre.
"The plaintiff argues that if we adopt the cost of cure approach, we should offset or deduct from the cost of cure what it otherwise would have cost to bring sewerage and water to the south remainder before the taking. This argument is based on the proposition that the south remainder would have borne a proportionate amount of the cost to develop the entire 22.49 acre tract before the taking. We reject this argument because after the taking the north remainder will still have to bear the same cost for sewerage and water which otherwise would have related to the entire tract. (Any cost of curing the south remainder is a net additional cost to the owner.) However, our rejection of this argument is immaterial because we are compelled to reject in its entirety the cost of cure approach as not being appropriate and logical for use in this particular case. Not only does it resolve into an exercise in mathematics because of many variable factors but its application is urged on the basis of cost items for residential development and we have concluded that the highest and best use of the south remainder is no longer for residential development, that its use is now speculative with the probability being that a well informed buyer would purchase it for ultimate use as some type of neighborhood commercial or for small service industries oriented toward the immediate dispatch of vehicles. We find that Mr. Willet, Mr. Lejeune and Mr. Williams all acknowledge either directly or indirectly that we can no longer consider the south remainder only in terms of residential development. Mr. Willet testified the use was now speculative with the probability of use for service industries oriented for the immediate dispatch of vehicles; Mr. Lejeune testified that the use could be either for a very small residential subdivision or for some type of neighborhood commercial; and, Mr. Williams testified that after the taking the south remainder became less desirable for subdivision purposes and that the comparable of Blakely to Reiger, et al. would lend itself more to commercial development than the subject property. There is no evidence in the record with respect to what the utility and other requirements are for development of the south remainder into usage other than residential or the cost thereof. We can only surmise that they are somewhat different in nature and cost from those related during the trial of this case. As Mr. Willet, we visualize the south remainder as an entity which presupposes *875 forgetting its original status. We agree with him that it is transitional to better use thereby rendering unjustified the cost of cure approach for residential development. A well informed buyer, even with an A-1 residential zoning, would, in our opinion, look ahead to other uses and would purchase the property and place a value thereon accordingly." (Written Reasons for Judgment, Record, pp. 62-66)
The trial court chose instead to be guided by the expert testimony of the Department's two appraisers and, accordingly, awarded severance damage to the south remainder at the unit rate of $1,000 per acre:
"Driggers and Willet estimated that the south remainder diminished in value after the taking by a total of $4,175.00 or $500.00 per acre stated as of the date of trial. However, it is apparent that these figures were not the controlling factor in their thinking but that the remainder was worth either $2,250.00 or $2,500.00 per acre after the taking. Mr. Willet expressly so stated. We accept a figure of $2,500.00 per acre as being reasonable and borne out by a preponderance of the evidence. Mr. Williams was rather indefinite as to what he considered to be the value per acre without regard to asserted special benefits or the cost of cure approach. We cannot agree with him that the value was reduced by more than one-half.
"Having set a value of $3,500.00 per acre for the entire tract prior to the expropriation and a value of $2,500.00 per acre for the south remainder immediately after the taking but expressed as of the date of trial, there results a severance damage of $1,000.00 per acre to the south remainder which equates to the sum of $8,346.00." (Written Reasons for Judgment, Record, pp. 66, 67)
Our review of the record in this case fails to disclose the commission by the trial court of any manifest error in its disposition of this severance damage issue so as to warrant reversal. At the outset it is important to note that the Louisiana Supreme Court has clearly indicated the "cost-to-cure" method should be resorted to only in unique situations and in special instances wherein the ascertainment of market value is not otherwise possible. As stated by the Supreme Court in State, Through the Department of Highways v. Mason, 254 La. 1035, 229 So.2d 89 (1969):
"At the outset it is apt to observe that there are no decisions of this Court which have approved the so-called `cost to cure' concept as such in determining severance damages in Louisiana. * * *

* * * * * *
"The `cost to cure' concept has been recognized and accepted in the jurisprudence of the Courts of Appeal in considering expropriation cases following the constitutional change in 1960 of the appellate jurisdiction of these courts and this Court. Three cases from the Second Circuit (the Michael, [Michael v. State Through Dept. of Highways, La.App., 129 So.2d 587] Dow [Dow v. Dept. of Highways, La.App., 179 So.2d 666] and Ouachita Parish School Board matters) and one from the Fourth Circuit (the Gwin case [Mississippi River Bridge Authority v. Gwin, La.App., 138 So.2d 175]) are relied on by relator in the support of this method of measuring consequential damages, which counsel for relator say the Court of Appeal failed to properly apply in this matter.
"We think the Court of Appeal was correct under the facts herein. The `cost to cure' concept has been brought into our appellate court jurisprudence apparently by various expert appraisal witnesses, and some appellate courts have adopted it without referring to it as a `cost to cure' theory. If such an approach has relevance to the measure of damages, it should only be employed to demonstrate a diminution in market value resulting from the partial taking, for we find no *876 sound basis in this Court's jurisprudence for the application of this method of assessing severance damages, save in a most unique situation (which is not present here) like that appearing in State [Through] Department of Highways v. Ouachita Parish School Board, 162 So.2d 397 (cert. denied). See also Nichols on Eminent Domain, 3rd Ed., Vol. 4, Sec. 12.32, pages 217-238, which indicates that this approach may be used in special instances wherein the ascertainment of market value of the facility is not possible." (State of Louisiana, Through the Department of Highways v. Mason, 254 La. 1035, 229 So.2d 89, 92, 93)
The Supreme Court in Mason went on to affirm the appellate court's refusal to adopt the "cost-to-cure" method proffered by the Landowner.
More recently, the Louisiana Supreme Court has demonstrated its disaffection with the "cost-to-cure" method not only for condemnation cases but also for inverse condemnation cases, as evidenced by the following excerpt from that Court's opinion in Reymond v. State, Through the Department of Highways, 255 La. 425, 231 So.2d 375, 384, 385:
"* * * The trial court judgment for $2500.00 for structural damage, affirmed by the Court of Appeal, was awarded on the basis of an estimate of cost of repair. This is not the usual criterion for computing damages in expropriation cases whether in condemnation or inverse condemnation. Ordinarily the measure of damages in expropriation proceedings is the difference in the market value of the property before and after the damaging or taking. Only recently we have criticized the so-called cost-to-cure concept in measuring damages in expropriation proceedings. We recognized the `before and after' rule to be the generally acceptable rule in this jurisdiction for assessing damages, and stated that other approaches may be used only in special or unique situations. State through Department of Highways v. Mason, decided November 10, 1969, 254 La. 1035, 229 So.2d 89." (Emphasis added)
We fail to see where the trial court manifestly erred in following the jurisprudence and in holding that the "cost-to-cure" method was not properly applicable to the instant case. As pointed out by the trial court, most of the evidence presented in conjunction with the Landowner's attempt to prove applicability of the "cost-to-cure" method addressed itself to "curing" the south remainder for residential subdivision purposes by supplying allegedly necessary utilities, whereas the trial court concluded that the south remainder had in all probability as its highest and best use, although still transitory, small commercial development. Of primary importance, however, is the fact that the instant case, as held by the trial court, is not such a unique situation as to warrant resort to the "cost-to-cure" method for determining severance damages to the south remainder. Neither of the experts for the Department felt it was necessary to use this method, and both indicated their ability to determine severance damages to the south remainder by resort to the "before and after value" method, market data, general knowledge and experience in the field. Chester A. Driggers, for example, testified as follows in this regard:
"A Mr. Ellison, I haven't made a study on bringing utilities into the remaining land. I would like to go over one point again, if I may,
"Q Certainly.
"A and state that I never made plans and did not consider selling that particular remainder for the purpose of developing a single-family residential property. But I have said and continue to say this remaining land as of the date of the taking, with the access to the public road and with the impact in the area, should have sold for twenty-five hundred per acre, and, of course, it would bring much more than *877 that today, in my opinion. And my estimate has been based on comparable sales along the road, similarly situated, recognizing the advantages and disadvantages and the mere fact that I did not make estimates [relative to bringing utilities to the south remainder] on the southerly remainder did not in any way in my opinion result in an error in the twenty-five hundred per acre, and I assure you that the land would have sold in the market, in my opinion, for twenty-five hundred per acre." (Record, pp. 177, 178)
Landowner further complains that even if the trial court properly rejected the "cost-to-cure" method, the trial court, nevertheless, failed in determining severance damages at the sum of $1,000 per acre for the south remainder rather than $1,250 per acre, in view of the fact that the Department's expert, H. Loren Willet, testified that the unit value of the south remainder after the taking was $2,250. This argument is without merit. In the first place, it is evident that the trial court accepted the testimony of Chester A. Driggers (as reproduced above, Record, pp. 177, 178) that the south remainder was worth $2,500 per acre after the taking as being the more reasonable estimate of its value instead of $2,250 per acre as testified to by Willet. (See Written Reasons for Judgment, Record, pp. 66, 67.)
Furthermore, the trier of fact has the right to evaluate the weight to be given to the testimony of each witness in an expropriation case and has the right to make factual determinations as to which of the factors relied upon by the witnesses relevantly influenced market value and severance damages. The trier of fact is not required to accept or to reject the testimony of each witness in toto. Accordingly, it has been held that the trier of fact is authorized to determine severance damages in an amount to which no expert testified by rejecting the precise amounts to which each expert testified, such being a necessary correlative of the fact-trier's right to evaluate the weight to be given to each witness' testimony, State, Through the Department of Highways v. William T. Burton Industries, Inc., 219 So.2d 837 (La.App. 3rd Cir. 1969), writ refused, 254 La. 14, 222 So.2d 67 (1969).
For the foregoing reasons, the judgment appealed from is affirmed, with all costs of this appeal assessed to Landowner.
Judgment affirmed.