390 So.2d 941 (1980)
CITY OF SHREVEPORT, Plaintiff-Appellee,
v.
Benedetto PUPILLO, Defendant-Appellant.
No. 14302.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1980.
*942 Francis M. Gowen, Shreveport, for plaintiff-appellee.
Freyer & Fox by Sam A. Freyer, Shreveport, for defendant-appellant.
Before PRICE, HALL and JASPER E. JONES, JJ.
JASPER E. JONES, Judge.
Defendant, Benedetto Pupillo, appeals a trial jury's award of $49,800 as the value of a grocery store and several apartments taken by plaintiff, the City of Shreveport (City), through expropriation proceedings. Defendant also complains of the failure of the trial judge to award attorney fees.
Defendant and his wife are the sole operators of a grocery store located in the area of Shreveport known as Allendale. Behind the store are twelve apartments which defendant rents for $45 per month. Pursuant to a federal block grant, the City sought to acquire defendant's property in order to use the land for a proposed park and recreational facility. The City tendered checks to defendant in the amounts of $37,600 and $10,000, respectively. The $37,600 was based on two appraisals of the value of the grocery store and its accompanying twelve apartments. The $10,000 was a payment designated as in lieu of relocation cost and was the maximum amount payable under a Housing and Urban Development regulation.
*943 The case was tried by the jury solely on the issue of the amount of compensation due defendant for the property expropriated. The jury returned an award of $49,800 and did not itemize which, if any, of the award was for business loss (value of the business exclusive of the property), and which was for the value of the property.
Defendant complains that the methods used by the City's appraisers were improper and resulted in too small an award. Defendant contends the amount at which the property was appraised for state, parish and local tax purposes should be used as the true value of the property.
John W. Landon and Marshall Graham, expert appraisers, prepared appraisals of defendant's property for the City and each testified at trial. To appraise the property, Landon used the cost approach, the income approach, and the market data approach. Under the cost approach Landon found the replacement cost for a new grocery store building to be $14.77 per square foot times 1,158 square feet (the size of the store) equals $22,428. He found the replacement cost for the apartments to be $13.45 per square foot times 6,315 square feet (size of the apartments) equals $84,914. He found the replacement cost for the porches and awnings to be $2.50 per square foot times 1,417 square feet for a total of $3,542. This total cost of all improvements taken of $110,884 (there is in this figure a slight error of multiplication) was depreciated by 70% ($77,619) resulting in the value of the improvements taken being $33,265, to which he added the depreciated value of a fence and the value of the land (determined by comparable sales) resulting in a total appraisal of $38,275. Under the income approach Landon found net potential rental income from the grocery store building and apartments to be $5,616. Landon capitalized this income at 15% and found the market value to be $37,500. Under the market data approach Landon used a gross rent multiplier[1] of 4.61 and multiplied this by the gross annual rent obtainable from the store and apartments in the amount of $8,160, and found a value of $37,600. Landon considered this approach the most reliable and therefore used it.
Graham used the same three methods of appraising the property as were used by Landon. Under the market data approach he arrived at a figure of $36,700. He, too, believed the market data method was best. Using the cost approach he evaluated the property at $34,000, and using the income approach he appraised the property at $36,300. Because of his feeling that the market approach was best, he used the $36,700 figure.
O. W. Dean was employed by the City to review these two appraisals. He found Landon and Graham had made thorough investigations, and recommended the higher figure of $37,600 to be offered to defendant. Dean's impartial review showed these appraisals to be competently and expertly handled.
Graham evaluated the value of defendant's business by using two methods, the first involved arriving at a net income figure for defendant's operations which he derived from defendant's income tax returns. The net income ranged from $18,490 in 1974 to $18,400 in 1976. Graham then calculated what it would cost to operate the store with two employees working a 6 day, 96 hour work week. Using wage rates paid by 7-11 stores to pay employees performing similar work as was required in defendant's operation, Graham calculated the salary expenses to be $39,000. Since the labor costs were greater than the income, Graham concluded defendant's business had no value.
*944 Defendant and his wife were the only persons working in the store. They had no employees. Unless the net income is adjusted for labor expenses, what appears to be a net profit is not really a net profit but in reality a labor cost. Graham's business evaluation was based on the idea that if a third party had bought the business he could make no profit from it if he had to hire labor to operate the store. If the purchaser did the work himself he would be simply receiving money earned from the work performed, not from any value attributable to the business.
Graham's second approach involved using comparable sales of grocery stores and comparable situations where the store was rented to a new proprietor. In the comparables used by him there was never an amount paid for any business over and above the value of the real estate, fixtures, and grocery inventory. He therefore again concluded the business had no value.
Defendant used the testimony of Steadman, his accountant, to attempt to establish that his business had a value above the value of the land and improvements taken. Steadman averaged defendant's net income for 1974, 1975 and 1976, and obtained an average figure of $15,851. He then multiplied this figure by six, an unexplained business technique, to arrive at a business evaluation of $95,106. Steadman's approach was actually similar to Graham's for obtaining net income, but Steadman failed to take into account the salaries of two employees needed to replace defendant and his wife. He stated he never included the value of the proprietor's labor to the business when evaluating a business. Because there were no salaries paid, Steadman refused to make an adjustment to his net income figure. If Steadman had made a reduction from his average net income figure for labor, then used his formula, he would have obtained the same result as Graham-a zero business value.
Defendant did not have an expert appraiser testify on his behalf. He called as a witness an employee of the Caddo Tax Assessor's office who testified that the records of that office reflect a 1974 appraisal of defendant's property for tax purposes to be $54,330. This witness did not know the name of the appraiser who made this appraisal, and this person was not called as a witness by defendant.
As stated in City of N.O. v. Giraud, 346 So.2d 1113 (La.App. 4th Cir. 1977), at p. 1118:
"In ascertaining the market value, much discretion is given to the trial judge in weighing the testimony of experts, and his finding of value based on such expert testimony will not be disturbed unless clearly erroneous. State, Department of Highways v. Browning, 315 So.2d 784 (La.App. 1st Cir. 1975); City of Baton Rouge v. Allied Chemical Corporation, 308 So.2d 295 (La.App. 1st Cir. 1975)."
In expropriation cases the trier of fact's decision of the amount for which a landowner should be compensated is a factual decision and as such should not be disturbed by us on appeal in the absence of manifest error. See Parish of East Baton Rouge v. Thomas, 346 So.2d 364 (La.App. 1st Cir. 1977); State, Etc. v. C. F. Breaux Inv. Co., Inc., 351 So.2d 1321 (La.App. 1st Cir. 1977); Greater Baton Rouge Airport Dist. v. Hays, 339 So.2d 431 (La.App. 1st Cir. 1976); State, Through Dept. of Highways v. Romano, 343 So.2d 222 (La.App. 1st Cir. 1977). Our function in an expropriation case is only to review the evidence in the trial court record to decide whether the trier of fact's factual conclusion is reasonably supported by the evidence. See State, Department of Highways v. Haydel, 306 So.2d 836 (La.App. 4th Cir. 1975).
The market data comparable approach of appraising defendant's property used by and prepared by Landon and Graham has been approved by our jurisprudence. See State, Dept. of Highways v. Bjorkgren, 147 So.2d 905 (La.App. 1st Cir. 1962) and State v. Romano, supra. The trier of fact, the jury here, is not required to accept or reject the testimony of any particular witness but may give whatever weight they consider appropriate to the testimony of any and all witnesses in making *945 their factual determination of the value of the property taken. See State v. Romano, supra.
Defendant argues the 1974 appraisal by the Caddo Parish Tax Assessor's office in the amount of $54,330 should be used as the value of the real property. The jury was entitled to give the testimony of defendant's witness from the Assessor's Office the weight they felt it should be given. Again, the jury is entitled to accept or reject the testimony of any and all witnesses, and its conclusion as to value need not coincide with the testimony of any particular witness. State v. Romano, supra; State, Department of Highways v. Thurston, 338 So.2d 154 (La.App.2d Cir. 1976); State, Dept. of Highways v. Salassi, 244 So.2d 871 (La.App. 1st Cir. 1971). We do not agree with defendant that the jury was required to accept the Assessor's office worker's testimony as the controlling factor in determining the value of the property.
Defendant also complains that $4,200 should have been awarded him as the value of his fixtures and furnishings. We agree with the City that the City never expropriated these items. Since these items were never expropriated, defendant is not entitled to an award for a loss which never occurred.
Defendant complains that he should be compensated for his loss of business and he quotes Louisiana Constitution 1974, Art. 1, § 4. Under this constitutional article and under the supreme court case of State, Through Department of Hwys. v. Constant, 369 So.2d 699 (La.1979), a landowner whose property is expropriated shall be compensated to the full extent of his loss, including business loss.
Defendant introduced testimony of his accountant who valued the business at $95,106. This accountant, Steadman, used a different method to evaluate the business loss from that utilized by Graham, plaintiff's witness. Steadman averaged the gross sales for three years and then took 65% off this figure for a total of $105,000. He also averaged the net income for three years and multiplied this figure by six and came out with $95,106, which is the amount at which he valued the business. Steadman offered no thorough or informative explanations as to why these particular methods were used, unlike Graham who exhaustively explained his techniques.
The jury had before it the business loss evaluation of Graham, who valued the business as zero, and Steadman, who valued the business at $95,160. It is peculiarly the province of the jury to evaluate the testimony of the witnesses and to determine what weight should be given it. Romano, Thurston, Salassi, supra. We note that the jury awarded defendant $49,800, some $12,200 over and above the property evaluation given by Graham and Landon and confirmed by Dean, but less than the $54,300 appraised value of the property for tax assessment purposes. Since the jury did not itemize its award, we do not know if the award included any business loss but the $12,200 in the award above the City's appraisals could well have been intended as an award for business loss. Considering the jury's function of deciding which witness to believe or of combining the testimony of all witnesses, we find no manifest error in their award and conclude that defendant has been adequately compensated for any business loss suffered by him.
Before this case went to trial defendant was offered, in addition to the $37,600, the sum of $10,000 in lieu of relocation payment. This payment is authorized by HUD regulations and is in lieu of actual relocation costs. $10,000 is the maximum amount authorized under the plan. Three tests must be met (1) the business cannot be relocated without a substantial loss of patronage, (2) the owners cannot be owners of other business not being acquired, and (3) a certain gross income must be derived from the business. The City, on reviewing defendant's tax returns, believed defendant qualified for this payment and offered him the maximum $10,000.
Defendant complains that the jury was misled into believing he would receive *946 this $10,000 in lieu of payment in addition to any amount awarded by the jury. (City has now indicated that it may not now authorize this $10,000 payment). Defendant points to a statement by Carl Conley, former director of Urban Development in Shreveport, in the trial of the rule to show cause why the judgment should not be made executory to the effect that he told the jury the owner would receive relocation funds regardless of their expropriation award. We have thoroughly reviewed Mr. Conley's testimony before the jury, and have in no instance found any such declaration by him, or indeed by any other witness.
Defendant also claims that when the trial court denied him the right to present evidence of relocation awards received by his tenants, the trial court in its statement of denial led the jury to believe defendant would receive the in lieu of payment sum offered by the City in addition to any expropriation award. We have reviewed this statement by the court and find it cannot be so construed.
The City's decision that it may now withhold the relocation award from defendant is an administrative one. No testimony was adduced at trial which would have led the jury to believe that defendant would receive this payment in addition to the expropriation award.
Defendant finally complains that he should have been awarded attorney fees under LSA-R.S. 19:8, which permits attorney fees to be awarded to landowner if the highest amount offered by the expropriation authority is less than the compensation awarded. The City offered defendant $37,600 for his property and $10,000 as a relocation payment:
"... Well then, we would offer and introduce that in evidence, Your Honor, the resolution allowing the expropriation of the parcel. Last but not least, for the record, we're prepared to make an offer or tender to Mr. Freyer on behalf of his client of the sum of $47,600 total, $37,600 being value of the appraisal on this property, and the $10,000.00 being what we call a relocation or a payment in lieu of. There is no stipulation, no strings attached. For the record, we have two checks drawn on the City of Shreveport, check number 91481 in the amount of $37,600.00, check number 91482 in the amount of $10,000.00 which we would offer to Mr. Freyer at this time as first settlement for all compensation due Mr. Pupillo." Transcript, p. 101, lines 5-20.
This statement of the City's attorney was not made in the presence of the jury. The difference between the amount awarded by the jury as compensation for the loss of his property ($49,800) and the amount offered by the City as compensation for the loss of his property ($37,600) is $12,200. LSA-R.S. 19:8 provides that the trial court may award attorney fees if the amount awarded the landowner exceeds the amount offered by the expropriating authority. Although the trial court is vested with discretion in deciding whether or not to award attorney fees, this discretion is not limitless. If we find the trial court has abused its discretion, we should reverse its decision not to award attorney fees. Cf. Claiborne Electric Coop., Inc. v. Garrett, 357 So.2d 1251 (La.App.2d Cir. 1978); La. Intrastate Gas Corp. v. Guidry, 357 So.2d 830 (La.App.3d Cir. 1978). A difference of $12,200 between the jury award and the amount offered for defendant's property is certainly large enough to justify the defendant's action of questioning in a court of law the award offered him by the City and, therefore, to warrant an award of attorney fees.
Although the record reflects the City may no longer offer the previously tendered relocation payment, defendant can still apply for this relocation payment as long as he submits his claim within 18 months after his displacement. See the following HUD regulation Title 24-Housing & Urban Development, Subtitle A-Ofc. of the Secretary, Dept. of HUD, Part 42-Relocation Payments and Assistance and Real Property Acquisition Policies Act of 1970, Subpart B-Relocation Payments, § 42.60(b). We have found no indication in the Act (42 U.S.C.A. 4601 et seq.) or HUD regulations adopted pursuant thereto that defendant's *947 assertion of his legal rights by contesting the amount offered him for the value of his property in any way impedes his right to apply for a relocation payment and in fact to obtain that payment (if, of course, he meets the requirements of Title 24, § 42.85(b) (1, 2, 3)[2] of HUD's regulation). If defendant applies for the relocation payment (of which application we have found no evidence) and is turned down or is dissatisfied with the amount awarded him, the HUD regulations provide a grievance procedure in which he can seek relief from an unfavorable determination. See HUD's regulation, Title 24, § 42.220 to § 42.290. Upon exhaustion of administrative remedies, defendant can seek judicial review. § 42.290.
Since defendant can still file for and claim the relocation payment, the City's total offer of $47,600 cannot be seen as an unconditional offer for his property. The so-called settlement offer which the City made to defendant (of $37,600 and $10,000) clearly contemplated that defendant would have no further claim to the relocation award.
Under the HUD regulations defendant, as property owner, does not forfeit the right to the relocation payment by litigating the amount to which he is entitled for the property taken. We therefore consider the City's offer for the value of the expropriated property to be only $37,600. Since the difference between the amount *948 awarded and the amount offered is so large, we find the trial court abused its discretion in not awarding defendant attorney fees.
We therefore amend the judgment to award defendant twenty-five percent (25%) of $12,200 (the difference), or $3,050.00 as attorney fees, and as AMENDED affirm.
NOTES
[1] This term is defined by Landon as:

"THE MARKET APPROACH TO VALUE
In the application of the Market Approach to value, the sale of three properties similar to the subject were analyzed, resulting in the development of a Gross Rent Multiplier.
The Gross Rent Multiplier is a factor which represents the relationship (a ratio) between the gross annual rent and the sale price of a sold income producing property. The procedure is simple and is often used as a measure of value by investors in their negotiations to buy and sell income producing properties."
[2] These requirements are summarized in HUD's Relocation Handbook which is in the record as follows:

"SECTION 3. PAYMENT IN LIEU OF ACTUAL MOVING AND RELATED EXPENSES
6-31. AUTHORITY. Section 202(c) of the Uniform Act authorizes payments in lieu of actual moving and related expenses for business concerns, nonprofit organizations, and farm operations that elect to receive such a payment and that meet certain requirements. HUD regulations in connection with payments in lieu of actual moving and related expenses for this category of displaced persons are set forth in Section 42.85.
6-32. GENERAL. A payment in lieu of moving and related expenses may be made to a business (except the owner of an outdoor advertising display) that elects to receive such a payment and that meets the eligibility requirements for a payment for moving and related expenses and the additional requirements set forth in this Section. To qualify for a payment, the business must meet the definition set forth in Section 42.20(a) of the regulations.
6-33. AMOUNT OF PAYMENT. A payment in lieu of moving and related expenses shall be equal to the average annual net earnings of the business concern or farm operation, but not less than $2,500 nor more than $10,000. (See paragraph 6-37 for definition of average annual net earnings.) Payment to a nonprofit organization shall be $2,500.
6-34. ELIGIBILITY REQUIREMENTS-BUSINESS CONCERN.
a. A displaced business concern may be eligible for a payment in lieu of moving and related expenses if the local agency determines that the business meets the three tests described below. Any business that meets these three tests is eligible irrespective of whether it continues or discontinues its operations.
(1) Test 1. The business cannot be relocated without a substantial loss of its existing patronage. Loss of existing patronage is presumed unless the type of operation is such that patronage is not dependent upon location in the neighborhood from which displacement takes place. Examples of this type of operation might be the general practice of law, medicine, or dentistry. If in the opinion of the local agency the business does not meet Test 1, it is the responsibility of the agency to demonstrate that the business will not suffer a substantial loss of existing patronage.
(2) Test 2.
(a) General Rule. The business is not part of a commercial enterprise having another establishment which is not being acquired for the project, and which is engaged in the same or similar business.
(b) Exception. The sole remaining facility of a business that has been displaced from its principal location shall not be considered as `another establishment' for purposes of Test 2 if, during the two taxable years prior to displacement of the major component of the business, the remaining facility had:
1 Average gross receipts of less than $2,000; or
2 Average annual net earnings of less than $1,000.
(3) Test 3. During the two taxable years prior to displacement, the business:
(a) Had average annual gross receipts of at least $2,000; or
(b) Had average annual net earnings of at least $1,000; or
(c) Contributed at least 33 1/3 percent of the average annual gross income of the owners or operators of the business."